```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4   UNITED STATES OF AMERICA, ET AL   )
     EX REL LAUREN KIEFF,              )
 5                                     )
                          Plaintiffs, )
 6   vs.                               )  No. 1:03-cv-12366-DPW
                                       )
 7   WYETH,                            )
                                       )
 8                        Defendant.   )
     - - - - - - - - - - - - - - - -   )
 9   UNITED STATES OF AMERICA,         )
     EX REL. WILLIAM ST. JOHN          )
10   LACORTE, M.D.                     )
                                       )  No. 1:06-cv-11724-DPW
11   vs.                               )
                                       )
12   WYETH,                            )
                                       )
13                        Defendant    )

14

15   BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

16

17           MOTION HEARING AND STATUS CONFERENCE

18

19           John Joseph Moakley United States Courthouse
                         Courtroom No. 1
20                      One Courthouse Way
                        Boston, MA 02210
21                  Friday, January 8, 2016
                           9:00 a.m.
22

23            Brenda K. Hancock, RMR, CRR
                 Official Court Reporter
24       John Joseph Moakley United States Courthouse
                     One Courthouse Way
25                   Boston, MA 02210
                      (617)439-3214
```

1     APPEARANCES:

2

3          UNITED STATES DEPARTMENT OF JUSTICE - CIVIL DIVISION
           By: Sanjay M. Bhambhani, Esq.
4              Kriss Basil, Esq.
               Zoila Hinson, Esq.
5          P.O. Box 261
           PHB Room 9140
6          Washington, DC 20044
           On behalf of the United States of America
7
           UNITED STATES ATTORNEY'S OFFICE
8          By: Gregg D. Shapiro, AUSA
               Brian Perez-Daple, AUSA
9          One Courthouse Way, Suite 9200
           Boston, MA 02210
10         On behalf of the United States of America

11         NEW YORK STATE ATTORNEY GENERAL'S OFFICE
           By: Carolyn T. Ellis, Esq.
12         Medicaid Fraud Control Unit
           120 Broadway, 13th Floor
13         New York, NY 10271
           On behalf of the State of New York
14
           COHEN MILSTEIN SELLERS & TOLL, PLLC
15         By: Jeanne A. Markey, Esq. (Via telephone)
               Gary L. Azorsky, Esq.
16         Suite 3610
           1717 Arch Street
17         Three Logan Square
           Philadelphia, PA 19103
18         On behalf of Plaintiff Kieff

19         MASSACHUSETTS ATTORNEY GENERAL'S OFFICE
           By: Steven T. Sharobem, Esq.
20         Suite 301
           10 Mechanic Street
21         Worcester, MA 01608
           On behalf of the State of Massachusetts
22
           SAKLA LAW FIRM
23         By: Sherif K. Sakla, Esq.
           425 Weyer Street
24         Gretna, LA 70053
           On behalf of William St. John LaCorte, M.D.
25
                     (APPEARANCES CONTINUED NEXT PAGE)

1    APPEARANCES CONTINUED:

2
         ROPES & GRAY LLP
3        By: Brien T. O'Connor, Esq.
             Harvey J. Wolkoff, Esq.
4            John P. Bueker, Esq.
         Prudential Tower
5        800 Boylston Street
         Boston, MA 02199
6            - and -
         By: Michael S. Casey, Esq.
7            Alicia Giglio Suarez, Esq.
         One Metro Center
8        700 12th Street, NW
         Suite 900
9        Washington, DC 20005
         On behalf of Defendant Wyeth Pharmaceuticals, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings were held in open court

2     before the Honorable Douglas P. Woodlock, United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6     Friday, January 8, 2016):

7          THE CLERK:  All rise.  This is Civil Action 03-12366

8     and 06-cv-11724, Lauren Keith v. Wyeth and John LaCorte, M.D.

9     v. Wyeth.

10         Court is in session.  You may be seated.

11         THE COURT:  Well, let me just start with a preliminary

12    matter, a more visual one, I suppose, than anything else.  I

13    learned, yet again, over the holidays that I am not 17 years

14    old, and, as a consequence of a pretty severe skiing accident,

15    I have found myself with a back that is causing pain.

16         Now, what does that mean to you?  What it means to you

17    is that you will see wincing from time to time, but you have

18    already seen wincing from time to time in response to the

19    arguments.

20                        (Laughter)

21         THE COURT:  Now there is ambiguity.  You will not know

22    whether I am wincing at the arguments or I am wincing in pain.

23                        (Laughter)

24         THE COURT:  But I just tell you that by way of

25    explanation so that you will not be entirely put off.

1       Let me try to start with what I think is the beginning

2   and then go to the end to shape these issues.  First, I want to

3   talk about the parties, and this is the Government's Motion to

4   Substitute Pfizer, and I do not know who is going to be

5   speaking to that.

6       MR. BASIL:  I am, your Honor.  Kriss Basil for the

7   United States Attorney's Office.

8       THE COURT:  So, let me just tell you, I guess I have

9   questions, but I will put it on a different plane, which is, I

10  am more interested in things than theory, and so a way for me

11  to think about this is to ask this question:  There is going to

12  be a jury questionnaire or a jury verdict slip that goes to the

13  jury.  What is the name of the defendant that is going to be on

14  the verdict slip?

15      MR. BASIL:  Your Honor, I believe it should be Pfizer,

16  because Pfizer is the --

17      THE COURT:  So, that tells me the story.  It is not

18  Pfizer.  All of the evidence in the case is going to be about

19  Wyeth, and so the idea of substitution raises, in my mind, the

20  aroma of bringing into the case another defendant which may or

21  may not have baggage that it carries in this court.  So, I am

22  not really interested in that.  That is why I say "things

23  rather than theory."  Now, there is no justification for

24  wafting extraneous matters before the jury.  There may be if

25  you think that Wyeth is not good for it, that is, if you get a

1    judgment in the case and Wyeth is not going to be good for it.

2         So, is that a real concern on the part of the

3    Government?

4         MR. BASIL:  Your Honor, we can't actually tell.

5    That's the issue.  The difficulty that we have is that we can't

6    square what Wyeth is saying about Pfizer with what Pfizer has

7    been saying about Wyeth.

8         THE COURT:  So, what do you want to do, then?  Do you

9    want to have discovery at this point about the ability to,

10   first, control the litigation, which seems to me to be pretty

11   clear that is what is going on with Pfizer?  Maybe Mr. O'Connor

12   will tell me otherwise.  And then to see whether or not there

13   are sufficient assets to be able to support a judgment, if a

14   judgment is reached in this case?  Is that what you would like

15   to do between now and, say, trial?

16        MR. BASIL:  Your Honor, I think we would not like to

17   engage in some further extensive discovery, considering

18   everything else that's on the table right now.  Rule 25 would

19   also allow a simple joinder of Pfizer as the successor in

20   interest, which would allow Wyeth to remain as the principal

21   named party, and Pfizer would just be there as successor in

22   interest.  And the United States has never taken the position,

23   your Honor, that Pfizer is responsible for or in any way

24   consulted or condoned what --

25        THE COURT:  But you were going to be happy with a

1    verdict slip that went to the jury that said "Pfizer" on the

2    top of it.

3                MR. BASIL:  Perhaps I misspoke.

4                THE COURT:  No, you did.  Trust me, you did.

5                MR. BASIL:  Yes, your Honor.

6                THE COURT:  You walked right into it, actually,

7    illustrating something that is going on in this case, which is

8    that the parties are playing a kind of game in which they would

9    like to have the benefit of things that are not in evidence,

10   like attorney-client privilege, and we will get to that, too.

11               But the short of it is the Government will be

12   satisfied, as I understand it, with Pfizer simply being added

13   as a party with a view toward having to deal with that at a

14   later point, if there is a judgment and if the judgment has to

15   be satisfied and if there is some other question raised about

16   that.

17               MR. BASIL:  Yes, your Honor.

18               THE COURT:  So, Mr. O'Connor, why not?

19               MR. O'CONNOR:  Your Honor, yeah, we do think Pfizer's

20   name should not be in if the conduct is not what Pfizer --

21   25(c) requires a transfer of assets.

22               THE COURT:  Theories and things.

23               MR. O'CONNOR:  Yes.

24               THE COURT:  Now, I understand I think the theory,

25   which seems almost jesuitical in its characteristics under

1    Rule 25(c), but I also understand chasing somebody for a

2    judgment if there is an issue about it, and the question is why

3    not put Pfizer in the case, add them in the case, join them in

4    the case, however we want to characterize it, and then, if it

5    comes to that, we get to the question of whether or not there

6    has to be discovery or whatever?

7         It is clear that there is now discussion about further

8    change in the corporate character of the parent, and so, rather

9    than getting into that now, we will get into it if there is a

10   jury verdict.

11        MR. O'CONNOR:  Your Honor, number one, I take from

12   your comments that you wouldn't have Pfizer's name mentioned at

13   all in front of the jury as part of the case.

14        THE COURT:  I do not see any reason for it.

15        MR. O'CONNOR:  Okay.  And with respect to joining

16   Pfizer, there is the element, and it happens, and we talk to

17   the Government about it all the time in these investigations,

18   that, to the extent this case is reported on, it will be about

19   Pfizer's subsidiary, or Pfizer faces, Pfizer -- your Honor,

20   that's harmful to the company.

21        THE COURT:  Well, wait a minute.  Let me just pause

22   with that.  You mean if Pfizer is sued, is the defendant --

23        MR. O'CONNOR:  Is a defendant.

24        THE COURT:  Just a moment.  If Pfizer is the

25   defendant, then there is disclosure, but if its wholly owned

1    subsidiaries are sued for the same amount it is not material?

2            MR. O'CONNOR:  I am not talking about material.

3            THE COURT:  Is this an SEC issue?

4            MR. O'CONNOR:  No.  I'm talking about a press issue

5    and all the constituents of Pfizer out there.  Your Honor, if

6    these cases get reported and we do talk about it, with all

7    these companies, when you acquire a company, like Pfizer

8    acquired Wyeth, it had nothing to do with the conduct --

9            THE COURT:  Let me just pause, then, because I have

10   not gone through the SEC filings, which I assume are the

11   publicly required filings as opposed to, say, public relations

12   putting out the fires.

13           MR. O'CONNOR:  Can I make one comment on the filings?

14           THE COURT:  Sure.

15           MR. O'CONNOR:  The one comment on the filings is,

16   Mr. Basil and the United States keeps talking about "Pfizer"

17   this, "Pfizer" that in the disclosures.  Its Pfizer and its

18   subsidiaries.  Wyeth is a subsidiary.

19           THE COURT:  I think I understand that part of it.

20           MR. O'CONNOR:  Okay.

21           THE COURT:  You will add to this to expand on the

22   discussion if I have missed something.

23           Now I want to go to the core of it.  Is Pfizer now

24   disclosing in its filings with the SEC this litigation as

25   material, if you know?  You may not know.

1          MR. O'CONNOR:  I don't know the answer to that.  I do

2    have a Pfizer -- I do have a client here.  I'm not sure if she

3    knows the answer, but I could check.

4          THE COURT:  Mr. Basil?

5          MR. BASIL:  Yes, it's in there.  It's in the financial

6    report that's attached to the 10-K filings.  It has been since

7    2009.

8          THE COURT:  So, are you counting on the public not

9    reading the SEC filings?

10         MR. O'CONNOR:  Yes.  I'm counting on the press

11   focusing on what's going on in this courtroom and who is a

12   defendant and more than a disclosure like that, that we have

13   acquired a company that has this litigation.  I think those are

14   two different things that could lead to different press

15   accounts.

16         THE COURT:  I do not.  My view is that I will permit

17   Pfizer to be added as a defendant in the case, that it is

18   entirely stayed unless and until there is a judgment in the

19   case, but it seems to me that sufficient information has been

20   brought to my attention here to justify it.  There are various

21   ways of dealing with that sort of thing at the end of the

22   trial.  First, you may win, in which case, apart from the

23   perception that Pfizer has gotten some public relations problem

24   that apparently was not available to diligent people in the

25   financial press before --

1          MR. O'CONNOR:  Your Honor, may I make a suggestion?

2          THE COURT:  Sure.

3          MR. O'CONNOR:  I would like to talk to the client

4    to -- I would like to talk to the Pfizer client about their

5    stipulating to pay any judgment if Wyeth is not good for it.  I

6    don't like, and 25(c) doesn't support --

7          THE COURT:  Oh, I am not sure it does not, if we get

8    to that point.  The question here is whether or not someone, if

9    they could properly at the time, filed this lawsuit, and it is

10   interesting that they waited for quite a period of time after

11   the acquisition to bring this matter up, but I am talking about

12   clarifying the pleadings.  If there is a stipulation, I suppose

13   that is fine too, or at least something to be considered.

14         MR. O'CONNOR:  Your Honor, my suggestion is to report

15   to you within a week, and I think the company would stipulate

16   to support the judgment so that it would not be added as a

17   defendant.  I really do, I mean it when I say that its

18   reputation can be impacted by being added as a defendant.

19         THE COURT:  It may or may not.  It may be that the

20   company is extra sensitive at this point in time.  But

21   essentially you are saying they are an indemnitor, and an

22   indemnitor brings himself right into the case.  You stipulate.

23         MR. O'CONNOR:  Your Honor, stipulate that the company

24   would pay any judgment that Wyeth did not pay if the jury

25   returned a verdict in favor of the Government.

1          THE COURT:  Right.  I am not interested in the

2    formalities of this, as I think I indicated at the outset.  I

3    will observe them, but I am less interested in the formalities

4    than in the substance of it.  The substance is this: that there

5    is another party who can be held liable in this case and may

6    formally say that they will be held liable in this case, and

7    the question is whether or not they need to be added as a

8    party.  If there is a stipulation, that is, I suppose, fine,

9    except, of course, if there is a change in corporate structure

10   for Pfizer.  However it is done I have no views one way or the

11   other.  I have stayed blissfully ignorant of corporate

12   reorganizations generally.

13          But this much is clear:  There is a right on the part

14   of the plaintiff to have the opportunity to bring litigation

15   against those who may have to stand behind a judgment in the

16   case, and it can be done at any point, virtually any point in

17   the case.  25(c) is not the only vehicle, as far as I am

18   concerned, for this.  It is not substitution.  It is adding at

19   this stage.  But if that is what you want, fine, and if your

20   client says, "We will stipulate but we do not want to be a

21   litigant in the case," then I will ask the Government why they

22   need them to be a litigant in the case.

23          MR. O'CONNOR:  I appreciate that, your Honor.

24          THE COURT:  So, we will get that by the 15th?  That is

25   a week from today.

1       MR. O'CONNOR:  Yeah, that's fine.  Thank you.

2       THE COURT:  So, let's, then, turn to -- I think it

3    might be, in terms of just structure, more helpful to talk in

4    terms of the so-called industry practice evidence.  Let me tell

5    you the approach that I will be taking in analyzing this.  I

6    think the approach probably effectively disposes of a number of

7    the matters here.  My view is that, unless the party about whom

8    evidence is offered is aware of and relies upon practice or

9    commentary, then it is going to be excluded.

10       Now, as I read the submissions the Government, the

11    proffers that are being made with respect to these so-called

12    industry practice or industry evidence or legal intermediaries

13    were all done without Wyeth's knowledge or understanding and

14    Wyeth did not rely on them.  They are just out there in the air

15    in so far as this case is concerned.  So, I am not sure that

16    any of this industry practice gets in in that fashion.

17       Mr. Wolkoff, are you going to deal with this?

18       MR. WOLKOFF:  I am, your Honor.  I am going to try to.

19    Whether or not Wyeth was aware of what others were thinking,

20    what others were thinking the evidence is going to show is

21    consistent with what Wyeth was thinking.

22       THE COURT:  That does not make any difference to me.

23    Let me be perhaps a little bit more clear.  My view is that the

24    regulations here are clear, unambiguous.  That is why I denied

25    the Motion for Summary Judgment here.  It should have been

1    clear that I did.  So, I will instruct the jury on what the

2    regulations mean, because I think they are clear.  I recognize

3    that this is a scienter case in which someone could say, "You

4    know, I had a good-faith disagreement about that."  But it

5    seems to me that the threshold for that good-faith disagreement

6    is to be able to show that the party that disagrees with how

7    the jury is going to be instructed had some outside basis that

8    they relied on for that evidence to come in, not that the

9    pharmaceutical industry can flock together and say, "We all

10   believe this," even if poor Wyeth never heard it.  It has to go

11   to Wyeth itself.  That it is out there that it might be

12   reasonable does not make it evidence in this case.

13              MR. WOLKOFF:  Well, your Honor, it does go to the

14   standard.  It goes to the issue of --

15              THE COURT:  What if I decide that the standard is

16   different, which I will, than what Wyeth thinks -- or has acted

17   upon, I should say -- whether it thought this or not is another

18   matter, but whether they acted on a view of the standard that

19   is inconsistent with what I am going to tell the jury?

20              MR. WOLKOFF:  But it shows, your Honor, that it's

21   probative, and the jury should hear whether or not Wyeth in

22   acting in that way was reckless, because we can show, we have

23   evidence to show that others were thinking and doing the same

24   thing.

25              THE COURT:  So, this becomes a trial about others who

1    were acting recklessly as well, and the point for purposes of

2    Rule 403 is, as far as I am concerned, to keep this case as

3    simple as possible.  Now, there may be administrative-law

4    issues that are raised by this, and everybody talks about

5    Lachman, of course, and I am somewhat familiar with Lachman.

6                 MR. WOLKOFF:  Yes, you are, your Honor.

7                 THE COURT:  I think Judge Boudin's opinion does not

8    directly deal with that aspect of it, but I took the position

9    there, and I think I am going to take the position here, that

10   first thing you have got to show is they were relying on this,

11   and in order to rely on it they had to know about it.  Now, if

12   there were some larger discussion about they knew it and they

13   relied on it, then we would go to the next step, which has to

14   do with reasonableness, I suppose, of that kind of reliance.

15               The pharmaceutical industry could get together, they

16   could say, "Well, we are going to file amicus briefs in all of

17   these cases.  We do not really believe it, but we are going to

18   file these amicus briefs in all these cases, because if we can

19   just kind of gather the wagons we might be able to put off a

20   discussion about what goes on when someone decides not to

21   comply with the rules that a judge says are the rules."

22               But we have not even reached that point, because, as I

23   understand the evidence in this case, Wyeth was unfamiliar with

24   the views that were expressed here.  They may have paralleled

25   those views, but they were unfamiliar with them.

1          MR. WOLKOFF:  Your Honor, I think the evidence would
2    show that they were familiar with some of them, with what some
3    of the other drug companies were doing, like TAP and
4    AstraZeneca, that they were familiar, so we will put those to
5    the side.
6          THE COURT:  Well, if there is an issue about whether
7    they are familiar, that is another matter, and we will put it
8    to one side.
9          MR. WOLKOFF:  And we put it to the side.  But we would
10   submit, your Honor, that even, for example -- and this evidence
11   is probative on a whole array of issues, recklessness.  It's
12   probative also, your Honor, on the question of materiality.  If
13   the Government is telling other drug companies, "We agree with
14   your interpretation that packaging," for example, "relates only
15   to multiple drugs at a single -- "
16         THE COURT:  If that is true, of course it is not
17   necessarily supported by this evidence.  What is supported by
18   the evidence is that lawyers at Covington & Burling and then
19   Hogan & Hartson at presumably regular billing rates are calling
20   up the FDA and asking questions 20 years ago, and they seem to
21   have recalled what the answers were when they were never
22   crystalized in actual positive law.  Now, it may be that that
23   passes for the common law in the District of Columbia, but I do
24   not believe that for purposes of administrative law that it is
25   in any way binding or even persuasive on the nature of the law.

1          So, what we have is a judge says, "Here is the rule.

2     I am interpreting the rule.  What do you know about it?"  You

3     say, "Well, we knew that TAP was getting away with it," which

4     is, "They got away with it so we should get away with it," an

5     argument that does not have a lot of force generally, and we

6     have got a couple of talking heads that will say, "This is what

7     the understanding was in the industry, and this is what someone

8     whispered to me or maybe full voice said to me over the phone."

9     No.

10          MR. WOLKOFF:  The jury should hear, though, your

11     Honor, with all due respect, on, for example, the issue of

12     materiality, that, had Wyeth called the Government, the

13     Government would have told Wyeth the same thing that --

14          THE COURT:  That is absurd, and it really goes to this

15     question of -- let's use the SEC, because we talked about it

16     before --

17          MR. WOLKOFF:  Sure.

18          THE COURT:  -- and because I am familiar with it.

19     Having worked in the Chief Counsel's Office of the Division of

20     Corporation Finance, I am familiar with the idea of no-action

21     letters.

22          MR. WOLKOFF:  Yes.

23          THE COURT:  But there you had a mechanism for

24     providing play in the joints.  Here we have got this kind of

25     telephone justice that is presented, and that is not material.

1      It leads to extraordinary speculation on the part of the jury.

2      Would the Government have responded the same way, assuming that

3      they believe the witnesses who said, "We had this

4      conversation," and, by the way, a conversation not fully

5      developed yet, because it is going to require a lot of

6      discovery -- would the Government have done the same thing with

7      the clients or with Wyeth as they did purportedly with the

8      clients who this testimony is supposed to reach?

9             MR. WOLKOFF:  I don't know, but one of the elements

10     that I have read about in the record, your Honor, is that the

11     Government is contending, "If you had only called us we would

12     have told you that -- "

13            THE COURT:  Do you think that is going to get in?  It

14     is not getting in.  The Government may have ideas about what

15     they think they are going to prove in this case or what

16     evidence they are going to submit in this case.  That is not

17     part of it.  The rule is going to be the instruction I give the

18     jury about what the relevant regulations mean.  People can say,

19     "Gee, we thought it was different."  This is a kissing cousin

20     to, "Ignorance of the law is no excuse," but they may offer

21     that, and that may go to scienter in some fashion.  The

22     Government is not going to be permitted, I do not think, to

23     say, "They did not even bother to call us to find out -- "

24            MR. WOLKOFF:  Okay.

25            THE COURT:  -- because that would open the door, I

1    think, to some additional evidence, believable or not, about

2    other people who did call or said they did and then got an

3    answer that they said they got.  But I simply do not see it

4    here.  And so, looking at it from that perspective, all we

5    have, I think, is you say they are aware of TAP or something

6    like that.  What do they know?  What is the evidence going to

7    be about what they know about TAP?

8         MR. WOLKOFF:  Well, they know that TAP, when TAP came

9    up with a similar, not only the oral product but also the IV

10   product, it began marketing in a similar contract, and

11   apparently was not, the inference is was not, and it's a very

12   strong one from the contract, your Honor, because they said,

13   "We can rework the price if it's determined that it's a best

14   price."  So, they were not reporting the same kind of contract

15   to the Government in connection with best price.

16        THE COURT:  How is that different from prosecutorial

17   choice?  That sounds to me like an argument about selective

18   prosecution.

19        MR. WOLKOFF:  No, your Honor.  Because under Lachman,

20   which we would say, by the way, your Honor, that a fair reading

21   of Lachman is that the First Circuit said, well, the evidence

22   may not be strong, in fact, it may be weak, but you don't have

23   to show as a defendant that you knew about it.

24        THE COURT:  Where does it say that?

25        MR. WOLKOFF:  Well, at page -- I don't know how to

1    read the pages on this, your Honor -- it's Page 5 in my book,

2    Paragraph 3.

3               THE COURT:  Paragraph 3.

4               MR. WOLKOFF:  On Page 20, your Honor, I am told.  I

5    could hand up the paragraph.

6               THE COURT:  No, I have it in front of me.  It starts,

7    Last, Lachman seeks a new trial --"

8               MR. WOLKOFF:  Yeah, it's Paragraph 20, where it

9    begins, We thus not decide --

10              THE COURT:  "We thus need not decide whether -- "

11              MR. WOLKOFF:  "Need not decide," yes.

12              THE COURT:  -- which sounds to me like they did not --

13   "-if the defendants had mounted a good-faith defense based on

14   exclusive use-a court would have been likely to admit the new

15   evidence in support.  The government says the evidence would

16   not be admissible, but case law may well leave this up to the

17   trial judge --

18              MR. WOLKOFF:  Yup.

19              THE COURT:  -- based on the usual considerations."

20              MR. WOLKOFF:  Yes.

21              THE COURT:  Which is not an affirmation of the view

22   that you have expressed.  They did not express that view.  What

23   they said is, "We do not reach it, and we are not sure, and, in

24   any event, it is up to the trial judge."  I think that is me.

25              MR. WOLKOFF:  That is you, your Honor.  And I know

1  that you are familiar with Lachman Three, but we would read the

2  phrase "the usual considerations" to allow this kind of

3  testimony to come in, namely, for example, on recklessness.

4  That's the standard.

5      THE COURT:  How does it come in on recklessness in

6  this sense?  Let's assume that there are two people who are

7  driving down the road and both of them run into somebody

8  because they are driving recklessly, and one of them is not

9  arrested by the State Police and the other is.  So, the one who

10  is not arrested establishes a standard of recklessness?  No.

11      MR. WOLKOFF:  But, your Honor, we are introducing

12  industry practice, not just one -- first of all, we have many

13  types of proof here.

14      THE COURT:  Look it, that they all did it does not

15  make it good.  We go back to, what is it, T.J. Hooper?  This is

16  not the industry gathering together and saying, "We all do it

17  so it is okay."

18      MR. WOLKOFF:  But, your Honor, when you have phrases

19  like "drugs of different types --"

20      THE COURT:  Well, now you are arguing the summary

21  judgment issue, which I have resolved, and I will instruct the

22  jury with respect to that, that you were wrong and the position

23  that the Government took is right.  I will not do it that way,

24  but I will simply say that is what this means under these

25  circumstances.

1          MR. WOLKOFF:  Right.  And then the issue is whether or

2    not Wyeth was reckless in interpreting drugs of different

3    types --

4          THE COURT:  But that does not bring in every evidence

5    in the world.  Law professors from some other venue, purported

6    experts, paid hired guns?  No, they do not come in to testify

7    with respect to that, and they do not come in because the usual

8    considerations include 403, which is not to mislead the jury

9    with respect to matters unfairly, and so it gets tried.  Here

10   is the rule.  They did not comply with the rule, if that is the

11   proof that the Government has.  They did not comply with the

12   rule.  They say, "Gee, we did not think it was the rule.  There

13   is a good-faith defense."  Whether or not they have made it is

14   another matter, but they have got to make it on evidence that

15   is, A, competent, and I am not sure that anything in

16   administrative law says that this would necessarily be

17   competent, and, B, is not violative of Rule 403.

18          So I start where I started before, which is, you show

19   me that they knew it about something and they relied upon it,

20   then I might let it come in.  I might not, but, in any event, I

21   might.  So, you tell me that they saw TAP doing it and they

22   said, "They got away with it.  I guess we can too."  They

23   probably did not say it quite that way.

24          MR. WOLKOFF:  Not quite that way, your Honor.  What it

25   demonstrates is that, with regard to these phrases, that the

1    industry was interpreting them in a certain way, and it is

2    probative of whether or not Wyeth in interpreting the phrase

3    the same way contemporaneously with the others was reckless.

4            THE COURT:  So, let's assume an industry that says

5    "No" means "Yes;" all of them believe that, all of them say

6    that because it is in their best interest to be able to

7    undertake particular kinds of marketing programs.  "No" means

8    "Yes."  We have a trial about whether "No" means "Yes"?

9            MR. WOLKOFF:  Well, you know, it's ironic here, your

10   Honor, because we have the opposite situation.  We have a

11   definition here that says --

12           THE COURT:  Let's assume the opposite, "Yes" means

13   "No," okay?

14           MR. WOLKOFF:  Yes.

15           THE COURT:  So, the difference, I guess, is that the

16   industry does not define it.  It may provide a basis for some

17   sort of good-faith defense that they knew that there was

18   something else going on, they heard something else, they paid

19   part of the fee to Covington or Hogan & Hartson for this

20   telephone call that provided, outside of the Federal Register,

21   some legal advice about what is going on.

22           But I do not have any of that here.  What I have is

23   them with their contract making their choice to do what they

24   did, and you tell me that TAP did it too, and they can see that

25   TAP did it too, because they can look at the materials.

1          MR. WOLKOFF:  What the evidence will be, your Honor,

2     for example, is that the company was familiar with the

3     provision that said that best price calculations don't include

4     nominal price, and, your Honor, it says "exclude nominal

5     price."  The Government is reading it to say "include nominal

6     price."  On the issue of whether or not when Wyeth read that

7     word "exclude nominal price" it was reckless, it is relevant

8     that an industry expert would say the industry practice at the

9     time, not subsequently, not something made up, at the time was

10    to read the word "excludes nominal price" as "excludes nominal

11    price."  It's the standard.

12          I would cite to your Honor the Getty Oil case from

13    2004.  It sets the standard.  How is the jury supposed to

14    determine what is reckless and what is not reckless if they

15    don't hear --

16          THE COURT:  If it does not start with an understanding

17    of this set of circumstances, and that is what I am being told

18    here, that is to say that your expert is going to testify to

19    something that nobody at Wyeth says they relied on.

20          MR. WOLKOFF:  Oh, no, your Honor.

21          THE COURT:  No, no, that there was industry practice.

22    Maybe this is going to change in the way that all of a sudden

23    Wyeth is relying on counsel and is prepared to tell us that

24    they are relying on counsel, a matter that we will get to in a

25    moment.

1          MR. WOLKOFF:  I understand.  But what we're saying is

2     that, what I'm saying is that the company, for example, in

3     reviewing this particular PPA, and its view generally is, that

4     when you look at the statement of best price and it says "Best

5     price calculations exclude nominal price," they read the word

6     "exclude" just the way it should be read, "exclude."  And the

7     fact that if the jury is going to consider whether or not Wyeth

8     in reading that word "exclude" to mean "exclude" was reckless,

9     the jury should hear how others in the industry, the industry

10    practice --

11         THE COURT:  If it is ambiguous, and the first step is

12    whether it is ambiguous, and, while I do not view the

13    characterization of "exclude" quite the same way you do on

14    this, the first element is does the judge say this is

15    ambiguous, the jury has got to hear about it?

16         MR. WOLKOFF:  Yes.

17         THE COURT:  I am not saying that.

18         MR. WOLKOFF:  I understand that, your Honor, but then

19    the next thing that the jury has to consider is when Wyeth read

20    that word "exclude" to mean "exclude" was Wyeth reckless?  And

21    it is probative.  The jury should hear that contemporaneous

22    with Wyeth's reading it that way others were reading it that

23    way.  Maybe the Government also was telling people to read it

24    that way.  The jury should hear that.  Otherwise they are

25    deciding recklessness, your Honor, in a vacuum.

1          THE COURT:  So, what do I do with T.J. Hooper, really?

2     That is the point.  That everybody in the industry believes "X"

3     means that that is the standard of care?  That is not the law.

4          MR. WOLKOFF:  I think, your Honor, Getty Oil says it

5     is, that, with all due respect, that you take into account

6     industry practice with regard to setting the standard.

7          THE COURT:  The question is when you get to industry

8     practice, and you get to industry practice, it seems to me,

9     when you can show that there is a knowledge on the part of the

10    actor with respect to the industry practice.  That is a first

11    step.

12          Now, I am hearing for I think the first time the

13    suggestion by Wyeth that they were aware of these matters.

14    They certainly were not aware of the two telephone calls,

15    unless all of a sudden they become aware of that.  So, that is

16    out.  They were not aware of this kind of generalized statement

17    by the purported expert, although the generalized statement by

18    the purported expert is just a way to get in a mass of

19    information that the expert purportedly relies upon here.  So,

20    I am not sure I am going to let that come in.  And now you tell

21    me, "Well, they knew that other people were doing that sort of

22    thing."

23          I think I understand the range of matters, and I will

24    hear from the Government.  But you tell me that Getty Oil is

25    better than Learned Hand, and I will look at it from that

1    perspective.

2         MR. WOLKOFF:  Well, I don't know that anything's

3    better than Learned Hand, your Honor.  I'll agree with that.

4         THE COURT:  Right.  But now we are talking about the

5    question of standard of care in a negligence setting.

6         MR. WOLKOFF:  That is one of the issues.  Another one

7    would go to materiality, your Honor.

8         THE COURT:  But what is the materiality?  You can

9    invoke materiality.  How is that material?  What does that make

10   more likely true than not true with respect to the question of

11   materiality that others got away with it or were doing it?

12        MR. WOLKOFF:  I think it is not a question of others

13   got away with it, your Honor.  It's that the latter part of it,

14   which, while others were doing it, the Government was aware of

15   it.  If we can show that the Government was aware of what

16   others were going, that does go to the issue of materiality.

17        THE COURT:  You mean it is materiality for the

18   Government, and so, as a consequence, if the Government knows

19   about all of this stuff, then that comes in?

20        MR. WOLKOFF:  For the jury to hear on fraud, your

21   Honor.

22        THE COURT:  And why doesn't that come in in every case

23   where there is what can be called "selective prosecution"?

24   Because that is what you are saying.  The Government did not go

25   after these guys.  They went after your client.

1          MR. WOLKOFF:  That's not exactly what we are saying.

2     We are saying in terms of deciding the issue of recklessness

3     having some base in deciding the issue of was this fraud

4     material.  The fact that Wyeth gave this PPA, your Honor, to

5     the Government, Wyeth wasn't trying to conceal anything.

6          THE COURT:  I keep thinking of, I guess it was in the

7     1920s there was a Solicitor General of the United States by the

8     name of James Beck who was known for quoting Shakespeare a

9     great deal.  The Supreme Court Justices tried to wean him away

10    from that, they had heard enough Shakespeare, but he used to

11    begin some of his arguments by saying, "In candor to the

12    Court...", and at one point Justice Holmes had had just about

13    enough of that and said, "You know, Mr. Beck, I have always

14    found that purported candor is the most successful form of

15    nondisclosure," something like that.

16         So they did it.  So they submitted it thinking the

17    Government is too dumb to do anything about it.  Whatever.

18    They are obligated to submit their PPA.  That does not give

19    them immunity.

20         MR. WOLKOFF:  Not immunity, your Honor, but a fact

21    that the jury should hear and be allowed to consider, along

22    with every other fact that your Honor --

23         THE COURT:  I just do not understand it from that

24    perspective, and it starts to raise the usual consideration of

25    Rule 403 for the trial court to protect the jury from

1    misleading information like that Pfizer is the defendant in

2    this case.

3              The parties want to play their hands.  That is fine.

4    On the other hand, there is someone who is going to be making

5    some choices about what gets to be presented to the jury.  This

6    one I find difficult to accept here.  So, unless there is

7    something more, I do want to hear from the Government about

8    this.

9              MR. WOLKOFF:  Yes, your Honor.  Thank you.

10             THE COURT:  Mr. Shapiro.

11             MR. SHAPIRO:  Yes.  I have a few points.  Or do you

12   have a question?

13             THE COURT:  No, go ahead.  You have heard what is on

14   my mind.

15             MR. SHAPIRO:  There is no evidence that Wyeth gave a

16   copy of the Protonix Performance Agreement to CMS during the

17   relevant time period, so there is no Government-knowledge

18   materiality.

19             THE COURT:  Let me pause with that, just to be sure.

20             Is there any evidence that the agreement was given --

21             MR. O'CONNOR:  I didn't hear Mr. Wolkoff to say that.

22   Yeah, the VA.  There is evidence, your Honor, about the PPA

23   going to the Veterans Administration.  And Mr. Shapiro knows

24   about that evidence.  In other words, I think -- well, I should

25   let Mr. Wolkoff speak.

1          THE COURT:  I just want to be sure.  Mr. Shapiro says

2     it never got to CMS.  Does that mean it did not get to the VA?

3          MR. SHAPIRO:  No, it went to the VA, and there was

4     discussion about it being a bundling arrangement, and the VA

5     decided, "We don't do bundling arrangements, and we're not

6     going to do this contract," or something to that effect.

7          THE COURT:  So, a parallel, similar contract went to

8     the VA and the VA rejected it?

9          MR. SHAPIRO:  More or less.  There was discussion of

10    this contract.  I don't know that the actual contract went, but

11    certainly there was discussion of it.  There was discussion of

12    the fact that it was a bundling arrangement, and the VA

13    chose -- it's, frankly, more complicated than I even fully

14    understand, but the VA decided to go in another direction.

15         THE COURT:  So, the evidence is just the VA?

16         MR. WOLKOFF:  The evidence is the VA, your Honor.

17    When I said the "Government," I meant the VA.

18         THE COURT:  But, unless we take the view that there is

19    a unitary executive, we are talking about CMS, right?

20         MR. WOLKOFF:  Yes we are, your Honor, but --

21         THE COURT:  And so there is no evidence, or is there,

22    that this was provided to CMS?

23         MR. WOLKOFF:  There is no evidence to that effect,

24    your Honor, but we would say that the fact that Wyeth gave the

25    contract, the PPA at issue, to the VA shows at least with

1    regard to its --

2         THE COURT:  So, what do I do?  Do I now have a VA

3    dimension to this case where Mr. Shapiro has to learn something

4    that he says he has not learned yet fully; that is to say that

5    the VA comes in and says, "No way would we accept this, it's

6    bundling," and does that go to the jury?

7         MR. SHAPIRO:  Frankly, I think that that interchange

8    does go to the jury because --

9         THE COURT:  Ah, I had every reason to believe that

10   that would be your position, and I have to tell you that I am

11   not interested in that.  This is part of the game.  You want to

12   have your part of it in here that is extraneous, they want to

13   have their part that is extraneous, and I started this, I

14   think, because I start most of these big cases this way, by

15   telling you that this is going to be tried like a Yankee meal,

16   you serve it cold and you slice it thin, and we are not going

17   to be getting into all this other stuff if it is not properly

18   to be presented to the jury using 403 as a background principle

19   of law.

20        So, we will get to what you think you are going to get

21   into.

22        MR. SHAPIRO:  Well, there is a distinction between

23   what the Hogan & Hartson and Covington & Burling lawyers were

24   talking or not talking about with CMS and what Wyeth was

25   talking about with the VA.  So, the difference is that Wyeth

1    actually had these conversations with the VA.  There's no

2    dispute that Wyeth knew about those conversations, and those

3    conversations in writing use the term "bundling."  We think

4    they're relevant.

5            THE COURT:  Well, we will get to that at a certain

6    point.

7            MR. SHAPIRO:  Okay.

8            THE COURT:  So, the short of it is you say CMS never

9    got it --

10           MR. SHAPIRO:  Right.

11           THE COURT:  -- and that is sufficient on these

12   grounds, right?  Is that it?

13           MR. SHAPIRO:  I think it's an important issue.

14           THE COURT:  So, what do we say about other people out

15   in the industry doing similar things that they are familiar

16   with?  They say that there is some evidence about TAP doing

17   this.

18           MR. SHAPIRO:  They are aware of TAP's sales practices

19   and what their contracts were.  Those have been produced in

20   discovery.  They are not aware of how TAP or AstraZeneca was

21   reporting their prices to CMS.  They can assume, but at least I

22   am not aware of any evidence that shows how TAP and AstraZeneca

23   reported their best prices and AMPs.  Those are confidential

24   reports.

25           Moreover, those TAP and AstraZeneca contracts, those

1    companies stopped doing it months after they started it, and

2    you can also assume why they stopped doing it, because they

3    realized, "This is going to get us in trouble."  Now, that's an

4    assumption, but if we have to get into all of that, we will.

5          But the evidence is limited to what they knew about

6    their sales practices, and if they want to make the argument

7    that that's relevant, maybe that comes in and we can deal with

8    it.  I don't think we get to the point of, well, they knew how

9    they were reporting to CMS, because there's no evidence of

10   that.

11         THE COURT:  Let's stop with AstraZeneca and TAP.

12   Let's assume that they offer the evidence that they did it at

13   least for a period of time.

14         MR. SHAPIRO:  Right.

15         THE COURT:  What is the Government's response going to

16   be?

17         MR. SHAPIRO:  I think the response is going to be the

18   same one that you just articulated, that if two people are

19   speeding down the road, one gets caught and the other one

20   doesn't --

21         THE COURT:  That is an argument.  What is the response

22   in terms of evidence?

23         MR. SHAPIRO:  Another would be that these companies

24   stopped doing it, and the assumption is that they stopped doing

25   it because they realized it was wrong.

1          If we're going to start getting into what other

2    companies were doing, we would get into the fact that Merck was

3    doing something like this.  They got caught, and they paid 200

4    and some million.  GlaxoSmithKline was doing something like

5    this.

6          THE COURT:  When did they pay it, during the time

7    period at issue?

8          MR. SHAPIRO:  No.  Well, we would get into their

9    internal emails about whether we think this is right.  I don't

10   think we should go there.

11         THE COURT:  Well, you can raise a parade of horribles.

12   I am not sure I am going to sit through the entire parade.  The

13   issue, I guess, for me is, okay, they say some member of their

14   Pricing Committee says, "We knew that TAP was doing this, we

15   knew that AstraZeneca was doing it, and it was reasonable for

16   us to think that we can do it."  The Government's response, I

17   guess, by way of evidence is, to the degree they knew it, they

18   also knew that they stopped doing it at a certain point.

19         MR. SHAPIRO:  Months after they started, and all of

20   this started three or four or five years after Wyeth had

21   started doing this, because they were the first ones to have

22   this IV on the markets, so the other companies couldn't do it.

23   Late in the game they started doing it and they stopped, and

24   then Wyeth kept going.  So, frankly, I think -- I don't know

25   that Wyeth is going to want to introduce this evidence, because

1    the evidence is going to show the other companies briefly did

2    this, they stopped, they realized it was wrong, and Wyeth kept

3    going, brazenly, in our view.

4        THE COURT:  I think I understand that.  Any other

5    evidence that you are aware of of the knowledge on the part of

6    Wyeth of this other material that is being offered?

7        MR. SHAPIRO:  No.  Wyeth went to conferences, and what

8    people said at conferences should be relevant to their

9    knowledge.

10        THE COURT:  That is your initiative, not theirs.

11        MR. SHAPIRO:  Well, that's our view.  But in terms of

12    the Covington & Burling, Hogan & Hartson, whatever Alexandra

13    Mooney and Matthew Skoronski have to say, Wyeth didn't know

14    about anything.

15        THE COURT:  Now let's turn to the two legal questions

16    that Mr. Wolkoff was pressing on me, number one, recklessness,

17    number two, materiality.

18        MR. SHAPIRO:  I spent last night reading the Fresenius

19    case, it's from the Northern District of Georgia from October

20    30th, 2015.  I can give you the cite, if you like.  The LEXIS

21    cite is 2015 U.S. District LEXIS 156924.  It's a very long

22    decision, and ultimately it says that a lot of this stuff comes

23    in, but there's a number of distinguishing facts between that

24    case and this case.  That case is about whether Fresenius,

25    which is a dialysis clinic which was administering Epogen to

1   the people who would come into the dialysis clinics, can use

2   the extra overfill that comes in each vial of Epogen and then

3   bill for it.  You can't do that anymore.  They say it was

4   ambiguous at the time.  The judge said you couldn't do it at

5   the time either, but in terms of recklessness, that Fresenius

6   was not reckless.

7        But it's a big difference, because during that time

8   Fresenius was openly telling the Government, telling the public

9   in SEC filings that, "We're billing for overfill."  They were

10  under a CIA with HHS, and they told HHS, "We're billing for

11  overfill."  They had lots of advice that they could bill for

12  overfill.  This is not that case.  There is no contemporaneous

13  evidence that Wyeth believed any of this stuff at the time.

14       THE COURT:  Belief is a different issue.  The question

15  is at this point for me what they knew and understood at the

16  time here, and also on this question of recklessness you say

17  Fresenius, which I read very quickly -- I have not read it as

18  carefully as I am going to -- but that Fresenius was fully

19  disclosing to the Government what it was up to.  You say they

20  are not, right?

21       MR. SHAPIRO:  You say that Wyeth was not?

22       THE COURT:  Right.

23       MR. SHAPIRO:  Correct.

24       THE COURT:  Now, what do you say about Getty Oil?

25       MR. SHAPIRO:  I have to say I have not looked at that

1    one.

2           THE COURT:  So, you and I both have to look at it some

3    more.

4           So, the short of it is I think you have some idea of

5    where I am going on these issues and what it is that you need

6    to do to move me off my general view.  I am aware that we have

7    got a trial date coming.  What that means in terms of discovery

8    or the need for discovery, you tell me now.

9           MR. O'CONNOR:  Your Honor --

10          THE COURT:  Let me just pursue my thought at this

11   point.

12          MR. O'CONNOR:  Of course.

13          THE COURT:  I have a series of motions *in limine* in

14   which the Government's response, as I understand it, is, "We

15   will respond if you want us to, your Honor."  I do,

16   particularly in light of this.  That is going to sharpen this a

17   little bit more, I think.  But the question of what kind of

18   discovery would be necessary under a minimum model, that is,

19   permitting the TAP stuff to come in, TAP-AstraZeneca stuff to

20   come in, what difference does it make in terms of discovery,

21   anything?  Is this something as salient as the attorney-client

22   privilege issues?

23          MR. SHAPIRO:  Well, the documents -- we subpoenaed

24   TAP, and actually I can produce the documents to Wyeth.  If

25   there are additional documents, that would raise new issues.

1    Neither side until very recently disclosed any witnesses from

2    those companies.  They recently disclosed corporate

3    representatives from the two companies.  We still don't know

4    who they are.  I guess we would want to depose them, if those

5    witnesses are --

6            THE COURT:  So, let me go back on this thing.  In

7    terms of the motions *in limine* which I think frame this a

8    little bit more precisely in some ways, how long do you want to

9    respond to them?

10           MR. SHAPIRO:  Could we have until after Martin Luther

11   King Day?

12           THE COURT:  Is that this month?

13           MR. WOLKOFF:  That's January, your Honor, yes.

14           MR. SHAPIRO:  I think it's this month.

15           THE COURT:  I think I have told you that I start trial

16   with Fresenius the day after Martin Luther King Day over

17   dialysis.  I would like it before then, I think next Friday.

18   That is the 15th.

19           MR. SHAPIRO:  Okay.

20           THE COURT:  I am going to be picking the jury in that

21   case and I am going to be using an extensive -- I believe I am

22   going to be using an extensive questionnaire.  So, the first

23   day of jury selection, which would be the 19th, things will be

24   happening but not involving me, and so we could have a hearing

25   then to try to deal with this.

1          MR. SHAPIRO:  Thank you.

2          MR. WOLKOFF:  May we file our brief reply on the

3    Monday, your Honor?  They are going to file on Friday.  We will

4    file a brief reply on Monday morning?

5          THE COURT:  Yes.  I hope it is not saying the same

6    thing again that has already been said.  If it is responsive to

7    something that could not reasonably have been anticipated, then

8    of course.

9          MR. WOLKOFF:  We will limit it, your Honor.

10         THE COURT:  So, by noon on Monday.

11         MR. WOLKOFF:  Thank you.

12         THE COURT:  But I interrupted you, because I wanted to

13   pursue this train of thought.  Mr. O'Connor.

14         MR. O'CONNOR:  Thank you, your Honor.  The first

15   matter I want to raise is this Carolyn McElroy evidence.

16   Carolyn McElroy was for 19 years a Medicaid Fraud Control Unit

17   prosecutor in Maryland.  She went to Mintz Levin.  She went and

18   gave speeches, I was there some of the time, back, you know, on

19   industry practices.  So, my point with respect to the evidence

20   that they cite repeatedly about Carolyn McElroy presentations

21   are two.  Number one, I think they are trying to get the jury

22   to accept that whatever Carolyn may have been saying was the

23   law, and, of course, it's not the law.  What you tell the jury

24   is the law is the law.  But I think for 403 reasons there will

25   be massive confusion if you had --

1          THE COURT:  Oh, I do not disagree about that, and we

2     will start to get to this in a bit.  But let me just say this:

3     Assuming that things are going where I think they are going on

4     this, but I have not finally decided it, and that is what the

5     office of motions *in limine* is, I think, to give the parties

6     some sense of where I am, but it is not over until it is over,

7     I do not see the evidence coming in of anything other than what

8     you were aware of.  You may not want to include anything that

9     you were aware of, you may not want to include TAP, you may not

10    want to include AstraZeneca, because it may not be a barn door,

11    it may be like one of those kitty doors, but the door has been

12    opened, and I am going to let things go in and go out, if that

13    happens.

14          So, now we turn to them saying or offering testimony

15    about things that their clients observed or heard.  If you

16    raise the issues of, "Gee, we thought that you could do this.

17    We talked about it, we talked about it in our Pricing

18    Committee, we thought it was okay," then I am likely to let

19    some of that come in by way of cross-examination:  "You also

20    heard Carolyn McElroy offer her views on this issue.  Did you

21    believe them, disbelieve them?  What did you think about

22    them?", that kind of thing.  Those things can come in depending

23    on what initiatives you pursue in what I will call the

24    good-faith defense generally.  I do not know enough about that.

25    I do not think you do yet.

1          I have told Mr. Shapiro that, without making final

2    gender determinations, he is the gander, you are the goose, and

3    the sauce is going to be the same for both of you.  So, that is

4    the general view on this.  If somebody makes a thrust, there

5    can be a parry.  I am telling you what the grounds are that

6    would permit a thrust, and that is that this was information

7    known to and relied upon, or, in the case of parry, "Why didn't

8    you rely on this information because it was known to you?"  So,

9    that is the way I am shaping this up.  We will start to get

10   into some of the witnesses in just a moment on that.

11        MR. O'CONNOR:  So, your Honor, my second point was

12   going to be about this industry practice evidence, and it is

13   not necessarily -- it's not industry practice, actually.  It's

14   lecturing about what could be or what is in the view of a

15   former prosecutor from Maryland who's trying to get clients to

16   call her a problem under the Medicaid law, and I think that it

17   is about industry-practice evidence in part.

18        But importantly too, your Honor, back to my first

19   point, I think the Government is setting that up in this

20   Policy 104, which was a Wyeth policy, as the law.

21        THE COURT:  We will get to that.  I think I do not

22   want to get to the motions *in limine* today, because they were

23   just filed, but also because I think you have to both absorb, I

24   hope absorb, what I have to say.  I hope it is capable of

25   absorption, too.

1          But this much is clear to me; that it is back to

2     thrust and parry, and so I am going to look at it from that

3     perspective.  If your people are going to say, "We had this

4     thought but they were exposed to something else," I think they

5     are going to have to be able to or should be prepared on

6     cross-examination to explain why they chose one and not the

7     other, and maybe they will say, "She was a prosecutor from

8     Maryland, she was looking to get business for Mintz Levin," as

9     opposed to, say, Covington & Burling or Hogan & Hartson.  I

10    will look at it.  I will use my 403 tools to deal with this

11    sort of thing.

12         But, for both parties, be careful of what you ask for.

13    That is all I am saying.

14         MR. O'CONNOR:  Your Honor, I'll just close in saying

15    with respect to that evidence it's not just the

16    industry-practice nature, and I take your point with respect to

17    AstraZeneca and TAP, but the jury can't, and this really is

18    under 403, be led to believe or walk away with what Carolyn

19    McElroy says is the law.

20         THE COURT:  Oh, I will disabuse them of that view.  To

21    the degree that what she says is consistent with what I say,

22    she is right.  To the degree that she disagrees with what I

23    say, she is wrong.  In any event, she is no different than

24    anybody else offering views in this area.

25         MR. O'CONNOR:  Your Honor, you had mentioned earlier

43

1   that, yes, we know that you have denied summary judgment, and I

2   think you have told us, "So assume it is denied, and then talk

3   about the evidence that should come in or not."  You also are

4   clearly forming your views as to how you will instruct the

5   jury.

6        THE COURT:  Right.

7        MR. O'CONNOR:  I would like to give you two minutes on

8   what our defenses will be so that you can understand that, if

9   you think it would be helpful.  There are five points.

10       THE COURT:  I think it would, but let me tell you what

11  else I think would be helpful at this point --

12       MR. O'CONNOR:  Yes.

13       THE COURT:  -- because we are moving on to jury

14  instructions, which is instructions with respect to the

15  operative language here.

16       MR. O'CONNOR:  Yes.

17       THE COURT:  You know what I think, I think.  You will

18  have to have fallen off the turnip truck not to know what I

19  think, but I would like to see what the two parties' views are.

20       MR. O'CONNOR:  Yes.

21       THE COURT:  Not holding you to your what I assume will

22  be a jury instruction that says, "This is highly ambiguous and,

23  consequently, you, jury, should make the determination."  I

24  will not be giving that, but you will want to preserve that.  I

25  am not holding you to that.  The final objections to jury

1    instructions are after I instruct the jury.  That is what

2    counts for the First Circuit.

3           MR. O'CONNOR:  Right.

4           THE COURT:  But I think a useful exercise now will be

5    for the parties to frame particular jury instructions on these

6    issues.  Now, having said that, yes --

7           MR. O'CONNOR:  No, I think it would be helpful --

8           THE COURT:  -- two minutes?

9           MR. O'CONNOR:  Two O'Connor minutes.  So, your Honor,

10   just real quickly --

11          THE COURT:  Those are non-New York minutes?

12          MR. O'CONNOR:  No.  So, your Honor knows that we have

13   got this 94-percent discount on the oral.  The Government is

14   trying to take that, say, even though that is the price that

15   hospitals paid, it really was an 89-percent price.  Nominal is

16   key here.  Point number one, your Honor, is the law is crystal

17   clear, and we talked about this at summary judgment.  I know

18   the Court made comments on it.  And we will brief, and I

19   appreciate the opportunity to be able at this time to talk

20   about jury instructions in a writing.

21          But our first point, your Honor, is that the nominal

22   exemption is, it's absolute.  The law is clear.  What the law

23   says, statute, the MDRA, the operational training guides, which

24   is all there, says the nominal prices are to be excluded from

25   best price calculations, and we will lay that out for you.  So,

1   that is, point one, the case for on the basis of the nominal

2   price exception should be over because there are no damages.

3   There's no change in the pricing on the oral or the IV.  The

4   Government's theory, your Honor -- I didn't know if that was

5   your back.

6             THE COURT:  That was not a wince.

7             MR. O'CONNOR:  Okay.  I want to stop, then.

8             THE COURT:  That was a rolling of the eyes.

9                         (Laughter)

10            THE COURT:  The failure of proof of damages was not an

11  issue in summary judgment, was it?

12            MR. O'CONNOR:  Well, no.  The theory of how you get

13  anywhere near damages is that we reported the wrong BPs, or

14  best prices, in our quarterly filings from 2001 to 2006, and

15  the only way they get there is to say that the prices that we

16  were selling the product for to the hospitals were not the real

17  prices because of the operation of the bundled-sale provision

18  in the Medicaid Drug Rebate Agreement.  The price on the oral

19  throughout the relevant period was a nominal price.

20            THE COURT:  But isn't this jury argument on the basis

21  of the instructions that I give --

22            MR. O'CONNOR:  I think so, but --

23            THE COURT:  -- as to factual matters?

24            MR. O'CONNOR:  Yeah.

25            THE COURT:  It is going to be expertise that says,

1   "Wait a minute, you have to understand this in a larger

2   economic sense."  So, I tell the jury nominal is excluded, but,

3   as President Clinton would say, define "nominal."

4          MR. O'CONNOR:  And the law does, and that is what we

5   will write to.  But I will put it up.  There are just a few

6   provisions, your Honor.  The only things available for us to

7   look at say that nominal prices are excluded, and when you look

8   at the MDRA definition of "nominal price," which I would be

9   happy to walk over and --

10          THE COURT:  No.  I will not say that your two minutes

11   are up, but I understand where you are going on this.

12          MR. O'CONNOR:  Okay.  So, point one is we win the case

13   on falsity on nominal price under the law.  In any event, that

14   is point one.

15          Points two, three and four are the key provisions in

16   the bundled-sale definition that we have talked so much about.

17   If they get by the nominal-price issue, they still have to

18   satisfy three different issues, drugs of different types,

19   packaging of drugs of different types, so the packaging

20   requirement and the purchase condition too.  So, those are two,

21   three and four points.

22          And I know the Court is going to instruct the jury on

23   it.  We do want to be heard, and we appreciate, I think, the

24   invitation to submit a writing with respect to what the Court's

25   instructions to the jury should be, and I think all of us on

47

1    both sides here would appreciate knowing that, because it is

2    important to how we would try the case.

3              THE COURT:  Of course it is, and so the question is

4    how do we do it and when and under what circumstances and what

5    effect does it have on discovery?

6              MR. O'CONNOR:  Point five, the last point, is just

7    that the only contingent discount, your Honor, in any

8    bundled-sale arrangement that the PPA might have represented,

9    and we say it did not, but the only contingent discount was on

10   the IV.  So, that discount moves, if any discount does, by way

11   of the bundled-sale provision over to the oral product.  The

12   oral product was a 94-percent discount.  It only increases that

13   discount and maintains its nominal status.  So, your Honor, for

14   that reason there would be no damages.

15             THE COURT:  All right.  I think I understand it.  I

16   think that there is embedded in it some jury questions.

17             MR. O'CONNOR:  Yes.

18             THE COURT:  But the Government did not move for

19   summary judgment in this case, so I do not know that entirely.

20   But it will be helpful to have what you now believe are

21   properly the instructions to give on those issues --

22             MR. O'CONNOR:  Yes, your Honor.

23             THE COURT:  -- without waiving your view about a range

24   of other issues.  But you know where I am on this, and so it

25   will be helpful, I think, for us to focus on that.  So, Friday?

1          MR. O'CONNOR:  Friday next?

2          THE COURT:  Friday the 15th for both.

3          MR. SHAPIRO:  For jury instructions?

4          THE COURT:  Not full jury instructions, just jury

5     instructions on this issue.

6          MR. O'CONNOR:  Yes.

7          THE COURT:  You think you do not really know what I am

8     going to instruct, and you may not afterwards, but to start

9     this discussion more meaningfully on those particular terms --

10    I think there were five points, but the counting has changed,

11    because were not two minutes -- on those five basic points,

12    proposed jury instructions.  We will talk about it and to help

13    me to think this through more fully and give you a better

14    understanding of where I am going to go at the same time that

15    we deal with the motions *in limine*, which, as I said, I think

16    shape this a bit more than they have before.

17          Now, I have lost track of what the trial schedule for

18    motions *in limine* and pretrial conference and stuff is.  Do any

19    of you have that off the top of your mind, because I want to be

20    sure I have got this right?

21          MR. BUEKER:  So the next time, you Honor, you were to

22    see us, your Honor, is February 8th.

23          THE COURT:  And that includes at that point the full

24    jury instructions and the full motions *in limine* kind of

25    practice?

1          MR. SHAPIRO:  We were going to file both by the 1st,

2     yes.

3          MR. BUEKER:  That was your final pretrial conference,

4     and we assumed the standard pretrial.

5          THE COURT:  Yes, that is my intent, but this requires

6     a bit more hands-on, and that is why I am putting this forward.

7     I am just trying to get a sense of what I am dealing with on

8     that.

9          MR. BUEKER:  Yes.

10          THE COURT:  So, let's turn to this attorney-client

11     thing, which I view as the ultimate in gamesmanship.  The

12     choice that Wyeth made was to assert the attorney-client

13     privilege up to and beyond summary judgment, up to and beyond

14     the time period that we had begun discussion, and apparently,

15     only because of learning that I would not let somebody say that

16     they are a lawyer and testify, that they decided to change

17     course entirely.  It does not work that way.  It was an

18     important decision to assert the attorney-client privilege.  It

19     does not get changed at the last minute.

20          Now, what does that mean?  The suggestion was that I

21     was excluding Mr. -- Alivernini?

22          MR. O'CONNOR:  Alivernini, your Honor.

23          THE COURT:  I am not, but he is going to have to come

24     under another flag.  The flag is maybe a member of the Pricing

25     Committee.  But he is not going to carry with him his admission

1   to the Bar or graduation from law school.  What is going on is

2   not very different from someone telling me that the jury

3   verdict is going to say "Pfizer" on it.  This is an effort to

4   get before the jury that someone legally trained made this

5   determination, which is to say, "He is a lawyer, but we will

6   not let you get a chance to examine on the basis of

7   attorney-client privilege, except now we will as to certain

8   documents."

9          And, of course, I have received this morning, or maybe

10  it was late yesterday, but, in any event, I have not fully

11  digested the State's response on this, which focuses more fully

12  on whether or not there was a bit of a shell game being played

13  with respect to the designation of attorney-client privilege

14  and the grounds for attorney-client privilege in the privilege

15  log.  I do not want to get into all of that, unless I have to.

16         But the short of it is people make their choices about

17  how they are going to litigate the case.  An important choice

18  made by a company like Wyeth early on is, "Are we asserting

19  attorney-client privilege?"  They made that choice.  They are

20  stuck with that choice.  They do not get to change that choice

21  at what is the 11th hour.

22         So, it is, from my perspective, a question of trial

23  management and discovery management and pretrial preparation

24  that says to me I am not going to permit them to waive what

25  they did not waive earlier on and to permit Mr. Alivernini to

1    testify, if he wants to, but he is not testifying as a lawyer,

2    and it is not going to be subjected to the jury, wink, wink,

3    nod, nod, "This is a lawyer."  He can be identified in some

4    other fashion, and he can offer his views, but he could not be

5    effectively cross-examined unless there was the opportunity to

6    deal with the attorney-client privilege matters that were

7    withheld until just now, and I am uncertain about the

8    bona fides of the tender of certain documents but not all

9    documents.  So, that is my basic view about this.

10          Mr. O'Connor.

11          MR. O'CONNOR:  Yes, your Honor.  Your Honor, first of

12   all, one thing the Court needs to know and hear is that we did

13   have a lot of discussion with the Government, it's on the

14   record, with Mr. Alivernini about what they -- they took

15   Mr. Alivernini's deposition.  They said he is someone who may

16   have relevant information.  They had a full day with him, and

17   there was throughout or at various parts in the deposition what

18   are you going to be permitted to ask and have answered,

19   notwithstanding that the company is not waiving the privilege

20   now?  And among those things is Mr. Shapiro pushed for, "Did

21   anyone consider, including you, the MDRA, the implications

22   under the MDRA of the PPA?"  The answer was, "Yes, I did,"

23   et cetera.  Mr. Shapiro pushed, and there was discussion about

24   whether or not an answer to what is the assessment or analysis,

25   whether that waives the privilege.  The Government agreed that

1    it doesn't waive the privilege.  And so, that's basically what

2    are the key elements of what Mr. Alivernini was permitted to

3    answer.

4          And I think, your Honor, that our belief about the law

5    has been that you can put out objective facts.  They have

6    argued, your Honor, on scienter -- and this is a fraud case, as

7    the Court knows -- that on scienter that the company was

8    reckless.  Part of the defense to the recklessness is did you

9    have the right people in the right chairs, did you before

10   evaluating any Medicaid issues, having Mr. Alivernini, a lawyer

11   with experience on the Pricing Committee and as a key person to

12   issue --

13         THE COURT:  This is saying, "We will show you that he

14   is a lawyer, but whether or not this is a lawyer who knows what

15   he is talking about who is prepared to defend whatever he said

16   is going to be excluded from you."  That is what was done.

17         MR. O'CONNOR:  But, your Honor, but, listen.  Whether

18   the company knew and understood that Mr. Alivernini was a

19   potted plant, to borrow from a Congressional hearing, or

20   someone who knew the Medicaid law, which Mr. Alivernini did, is

21   important to rebut a fraud suggestion of recklessness.

22         THE COURT:  It is, and you made a choice, and the

23   choice was, "We are not going to permit the full

24   cross-examination of Mr. Alivernini."  This is back-and-forth

25   strategic stuff.  People make those choices all the time.  I

1    have confronted cases, particularly in patent cases, in which

2    the lawyers come to me early on and say, "We do not know yet

3    whether or not we are going to assert attorney-client

4    privilege.  Can we have protection up until 'X' date?"  Maybe

5    it is the date that you do the Markman hearing, maybe it is a

6    date that has to do with summary judgment on some matter.

7    "This is critically important."  Nobody did that here.  What

8    happened is that the company took a position, not quite a

9    stonewall, but a field stone fence around the underlying

10   attorney-client discussions, and then they did not.  So, what

11   we have is, to go back to thrust and parry, we have the use of

12   it as a shield right up until the point that it looked like it

13   might be better as a sword, and the kind of offer that, "Now

14   you can do what we did not let you do before, that is, get your

15   hands on at least some of the attorney-client privilege."  It

16   is not going to work that way.

17          MR. O'CONNOR:  Your Honor, we would give every scrap

18   of attorney-client privilege --

19          THE COURT:  Why didn't you do it before?

20          MR. O'CONNOR:  Well, because, your Honor, we were

21   reading the law to say that the privilege is about

22   communications, and they apparently agreed with us in terms of

23   what constitutes a waiver if you allow Mr. Alivernini to do X,

24   Y or Z in his testimony.

25          THE COURT:  There is none of this.  You chose to not

1     disclose until you decided last month because of the way in

2     which this trial was developing that it was better for you now

3     to disclose.  This was a choice that was made during the course

4     of discovery, to hold back, and now you are prepared to let at

5     least some of it hang out, and the train has left the station

6     on this.

7          MR. O'CONNOR:  Your Honor, we were relying on the law

8     that was available to us.

9          THE COURT:  What is the law?  Do you mean that you

10    were asserting the attorney-client privilege knowing that it

11    was not applicable?

12         MR. O'CONNOR:  No, I don't mean that.

13         THE COURT:  So, you asserted the attorney-client

14    privilege, you have it on a privilege log, you do not let him

15    testify to it, and you say, "We were relying on the law."  Good

16    for you.  You can rely on the law.  You can rely on the law of

17    attorney-client privilege.  It is not going to get before the

18    jury one way or the other.  That is your right.  But, by the

19    same token, you do not get to change it at the last minute at a

20    time when we are cranking up for trial.

21         MR. O'CONNOR:  I hear your Honor.  We go back a month.

22    It's where we are now.  We would be very happy to go forward

23    without waiving the privilege with the legal principles that we

24    have reason to believe, and we briefed it for your Honor, were

25    applicable.  Where we cut off and where they agreed is no

1    attorney-client privilege communications.  Your Honor, there's

2    never been a suggestion, the law doesn't support, that we ought

3    not be able to identify Mr. Alivernini as a lawyer or go to his

4    training.

5         THE COURT:  To the contrary.  This is core 403 stuff.

6    Somebody does not come in here bathed, if one is bathed, in the

7    aura of legal training and not get to be cross-examined on the

8    basis of the kinds of legal analysis that that person has done.

9    This presents it fairly clearly.  What you want is to get

10   before the jury, "He's a lawyer.  Lawyers are smart.  Lawyers

11   know the law," and because you know that you cannot get away

12   with that --

13        MR. O'CONNOR:  Well, we do --

14        THE COURT:  Just a moment -- you know you cannot get

15   away with that without waiving the privilege, you are now

16   prepared to waive the privilege.  Too late.  The parties have

17   made their choices on this, and the idea that this is going to

18   be permitted to consume time that should be spent on

19   preparation on the basis of what lawyers chose to do in this

20   case and the parties chose to do -- taking the attorney-client

21   privilege is reflexive for lots of people, maybe because they

22   think it does not have consequences.  Well, it does here in the

23   sense that you do not get to use it in that form.

24        Now, what I am proposing is this; that Mr. Alivernini

25   can come in and testify he has looked at these regulations, he

1    drew the conclusion that X, Y, Z.  But he is not a lawyer.  He

2    is not saying, "I am a lawyer.  I graduated from," wherever he

3    graduated from.  "I am a member of the Pricing Committee."  I

4    think that covers all of that.  "I am a senior manager on the

5    Pricing Committee."  That is the way I would view it.

6           MR. O'CONNOR:  Your Honor, as some of them were, and

7    some of them were not as much, "I knew the Medicaid law."

8           THE COURT:  Not "knew."  "I have reviewed the Medicaid

9    law."

10          MR. O'CONNOR:  I have reviewed.

11          THE COURT:  "And I drew these conclusions."  But it is

12   not going to be, "And, by the way, I am a lawyer," just like

13   the judge is a lawyer, judges are just failed lawyers.  No, it

14   is not going to work that way.  That he is going to be

15   testifying as a senior manager who has reviewed the law in this

16   area and came to this conclusion, and he is going to be

17   cross-examined but not by someone saying, "You are a lawyer,"

18   or bringing that out in an indirect sort of way.  But there was

19   a crossroads a long time ago that was taken, and it does not

20   get changed.

21          MR. O'CONNOR:  Your Honor, I want to say again,

22   respectfully, our view of the law at the time and today with

23   respect to what should be permitted or would be permitted -- I

24   hear you on 403.  That's your call.  But the precedent says

25   that facts like objective facts, like what we would want Mr.

1  Alivernini to testify to, to include that he is a lawyer and he

2  has certain training --

3              THE COURT:  No, because --

4              MR. O'CONNOR:  -- especially in a recklessness case,

5  your Honor.

6              THE COURT:  Look it, if you want to present him as a

7  lawyer and that that is something that the jury should

8  consider, then he should be permitted to be cross-examined on

9  the basis of legal opinions that he would have offered, and

10  that was withheld.

11             MR. O'CONNOR:  Your Honor, in terms of the amount of

12  material, he has already been deposed in great detail.  He has

13  been deposed in great detail.  There are not a lot of

14  documents, there just aren't.

15             THE COURT:  So you say.  My view is if this had come

16  up to me during the course of discovery, and if you had said to

17  me during the course of discovery one of two things, this is

18  not anything other than to explain my larger view of this, "We

19  need to hold back on this.  Waiving attorney-client privilege

20  is a really tough thing for any company, particularly a company

21  in a highly regulated area like this," I would have considered

22  it.  But that was not presented.  If someone had come to me and

23  said, "We are only going to not disclose this much stuff, here

24  is why," I would think about it, but I would probably say you

25  have got to make your choice; you either disclose or you do not

1    disclose.

2          The short of it is nobody came to me.  Not that I am

3    the be all and end all, but you make your strategic judgments.

4    A strategic judgment was made during the course of this case to

5    proceed with attorney-client privilege.  However refined it

6    was, this much is clear, that you say the law permitted you,

7    and I think it probably did, I am sure it did, to withhold, but

8    now, a little bit like Sally Rand, there is going to be some

9    partial disclosure of some documents.  You say it is enough.

10   There is reason to question that raised by the state, more

11   specifically by the state people here, and all I know about

12   that is we are all going to be going down the rabbit hole if we

13   spend time on that.

14          We have got a trial date.  You made a choice.  You are

15   stuck with it.  And so now we are dealing with how are we going

16   to present this to the jury, and I have told you the general

17   view, which is Mr. Alivernini -- I apologize in advance.  It is

18   going to happen throughout the trial.  I would be "Woodless P.

19   Douglock," if I had to address myself.  I have trouble with

20   names.

21                            (Laughter)

22          THE COURT:  But Mr. Alivernini will be able to testify

23   that he was a senior member of the Pricing Committee, if that

24   is what it is, but there will be some protocol.  But the

25   protocol will not introduce to the jury subliminally the idea

1    that this is a lawyer doing lawyerly things.  This is a senior

2    manager making choices in the analysis of regulations, and

3    maybe he is better than other people, maybe he is not, but not

4    on the basis of being a lawyer.  That is the only way I know to

5    fairly deal with this last-minute gaming vision on the road to

6    Damascus.

7        MR. O'CONNOR:  Well, your Honor, we moved as quickly

8    as we could, within a few days after we understood that the

9    Court saw this on 403 grounds or other grounds as the right way

10   to proceed.

11       THE COURT:  You moved quickly when you saw what the

12   nuance was going to be, but it was not until it was clear that

13   this is a case that is going to have some problems for purposes

14   of reliance that is supposed to support the scienter defense

15   that Wyeth had.  Is it a good strategic judgment?  Probably.  I

16   am not in that game anymore.  It might make some sense to do

17   it, but it is too late to do it at this point, not after all of

18   this development.

19       So, that is the broad outline of what I am going to

20   permit with respect to Mr. Alivernini or the people who are

21   listed as other witnesses and counsel.  I do not know if there

22   is someone more than Mr. Alivernini.

23       MR. O'CONNOR:  Your Honor, this is part of it.  They

24   know Mr. Alivernini well.  They've deposed him for seven hours.

25   The only thing that, just on communications with the client is

1    the only area that he was not allowed to testify to, given the

2    company's assertion of privilege.  Craig Holden is an outside

3    lawyer that Mr. Alivernini relied upon.  The Government knows

4    Mr. Holden's views on this case very, very well because they

5    interacted directly with him for three years, two years during

6    the damages period and another year or two after that, on these

7    very issues.  He is the only other one we have named, put in

8    there by name, and there really aren't -- they are really the

9    key -- Kevin Brady is a lawyer at the company and during

10   '05-'06 he was in --

11          THE COURT:  None of them are going to be able to

12   testify as lawyers.  That is my view.  This is an effort to

13   present light, a reliance on the advice of counsel defense.  It

14   may not be direct, it may be oblique, but that is what it is,

15   and having asserted the attorney-client privilege at this

16   stage, as I say, you have made the choice, your client made the

17   choice.  So, that is how those people are going to be received

18   here.  Now, it may be a problem for outside counsel, but I am

19   not sure.  Did he in his communications with the Government

20   say, "I am waiving my attorney-client privilege, my client's

21   privilege, so I can talk to you?"

22          MR. O'CONNOR:  No, your Honor.  What happened, just so

23   I can flag it for you, there was a subpoena at the end of

24   December, in December of '04 or January of '05, and Mr. Holden,

25   who is an expert on Medicaid law and also is a litigator type,

1   came in to help the company deal with the subpoena and talk to

2   the Government about the Medicaid issues, and so that's how the

3   Government knows his views with respect to that.

4       THE COURT:  It is not a matter of knowing his views.

5   It goes to the core of what kinds of defenses to scienter are

6   available and are going to be presented.

7       MR. O'CONNOR:  Yeah.

8       THE COURT:  That they know some but not all, they have

9   been exposed to some but not all of the opinions there, and

10  certainly not the ones that involve attorney-client privilege

11  or the assertion of work-product privilege, means that they are

12  hamstrung, and the way in which they are hamstrung is that

13  additional discovery has to be undertaken.  And so, if it is an

14  offer now to do what could have been done and should have been

15  done earlier, if this was the choice, it is far too late for

16  this.  That is my basic view, unless the Government has

17  something else that they want to say about this.

18      MR. SHAPIRO:  No, your Honor.

19      THE COURT:  So, I think you understand where I am.

20  You will think about what the protocols are for these several

21  witnesses.  I think I have dealt with the matters that the

22  parties wanted to have me address here.  From Wyeth's

23  perspective, they wanted to have addressed the several

24  motions *in limine* that have been submitted, and particularly

25  the exclusion of nominal prices and the internal Policy 104.

1    You have got some sense of the way in which I am going to

2    approach that, but I want to have a more fulsome discussion of

3    that, and what I am going to suggest is that we do that on the

4    day after Martin Luther King at, let's say, 11:00 that day.  I

5    will have talked to the jury in the Fresenius matter.

6            MR. O'CONNOR:  That is on the Policy 104?

7            THE COURT:  That is all the motions *in limine*.

8            MR. O'CONNOR:  That have not been addressed?

9            THE COURT:  That have not been responded to by the

10   Government.  The Government will have responded to them the

11   Friday before, and then by noon you will, if you think it is

12   necessary, have replied.  And there will also be these kind of

13   shaping instructions with respect to the legal issues that are

14   involved in the case here and the way in which instructions

15   will be given.  So, I think that deals with those matters that

16   the parties have asked to have addressed.

17            There is this question of the service of trial

18   subpoenas that is raised by the Government.  I want a specific

19   statement with respect to each witness, not just a kind of

20   wholesale, "We are going to do it, we think it is a good idea,

21   please bless us."  So, if you have got witnesses that you are

22   going to be sending subpoenas out to, I want some explanation

23   of necessity.  It does not have to be chapter and verse, but it

24   has got to be something more than, "Good cause exists to permit

25   such service because this case involves nationwide conduct,

1    and, as a result, people live in different parts of the

2    country."

3              MR. SHAPIRO:  Understood.

4              THE COURT:  So, maybe that can be done as promptly as

5    possible there.  It is not that I am going to be parsimonious

6    about permitting it, but I suspect it is things like, "These

7    people will not show up unless we do this, require this kind of

8    subpoena," or something like that.  But, in any event, you will

9    do it, but it has to be specific people.  That is not a "Get

10   Out of Jail Free" card process.

11             Now, I do not think there is anything else.

12             MR. BUEKER:  There was one other issue we raised, your

13   Honor, if I might.

14             THE COURT:  Sure.

15             MR. BUEKER:  On the issue of the pharmacy directors,

16   there are still 13 pharmacy directors --

17             THE COURT:  I had that in mind, but I was going to

18   talk about it in light of the submissions that were made about

19   the provisional trial schedule.  I think I understand what is

20   involved here.  Let me just deal with it.  I am not holding

21   myself up as Solomon on this, but there are certainly Solomonic

22   craft values involved in this resolution.

23             You both get four of these pharmacists.  We are not

24   going to have a parade of pharmacists in here.  You have got to

25   identify who they are going to be at this stage so that there

1   can be meaningful depositions of the precise people who are

2   going to testify here.  I do not mean to suggest that every

3   pharmacist looks like every other pharmacist, but you have got

4   a sense of what it is that you want to prove with these

5   pharmacists.  Settle on them.

6          Now, what is the problem with that, apart from wanting

7   to maintain flexibility?  Mr. Shapiro, you are the one who has

8   got the most pharmacists.  You have got a deep bench strength,

9   I should say, but you have not indicated that you want more

10  than four pharmacists to try.

11         MR. SHAPIRO:  I have no problem with the limitation of

12  four at trial.  It's somewhat difficult for us to get down to

13  four right now, because we haven't had a chance to go back and

14  talk to all of them.

15         THE COURT:  Well, but how long are you going to take?

16  Because I am going to permit depositions, obviously, of these

17  people.

18         MR. SHAPIRO:  Right.

19         THE COURT:  And the depositions have be to done in a

20  timely fashion.

21         MR. SHAPIRO:  Could we have until the end of the month

22  to give a list of four?

23         THE COURT:  Is that a problem for you, Mr. O'Connor?

24         MR. O'CONNOR:  I'm sorry.  I didn't hear what

25  Mr. Shapiro said.

1          MR. BUEKER:  We have no problem with that.  We just

2   want to make the point that by allowing -- we are still going

3   to take the position these people should not be permitted to

4   testify at all, just to be very clear, but subject to that, the

5   timing --

6          THE COURT:  When you say they are "not permitted to

7   testify at all," what does that mean?

8          MR. BUEKER:  Because what one pharmacist may say about

9   his interpretation has nothing to do with --

10         THE COURT:  But he is not going to be interpreting, I

11  do not think.  He is going to be talking about his interplay

12  with -- Mr. Shapiro will tell me if I am wrong -- he is going

13  to talk about his interplay with whoever the customer rep is or

14  whatever at Wyeth who is offering him opportunities.

15         Am I right about that or not?

16         MR. SHAPIRO:  Yes, and what they did after they signed

17  the contract, what they did to implement the contract.

18         THE COURT:  What Wyeth did to implement the contract?

19         MR. SHAPIRO:  And what the hospital did.

20         THE COURT:  That, it seems to me, is not their

21  interpretation.  They are just talking about an economic

22  exchange that they had.

23         MR. BUEKER:  We can take it up with the full record

24  after the depositions.

25         THE COURT:  That's fine.  So, we have got four.  They

1   are going to identify theirs by the end of this month --

2           MR. SHAPIRO:  Yes.

3           THE COURT:  -- so that depositions can be permitted

4   with respect to them.  Have you taken the depositions of

5   theirs?  Are you going to do the same thing?

6           MR. BUEKER:  We will identify them by the end of the

7   month, too.

8           THE COURT:  So, come to repose with respect to four.

9   I think that is a reasonable Whitman's Sampler of pharmacists

10  that can be presented to the jury, if I permit it, and I am

11  likely to, but just so you know on it.

12          Now, the only other thing, although maybe I should go

13  through this more specifically, I turn to Page 6.  This is a

14  discussion we had earlier about the designation of people as

15  current or former Wyeth employees or counsel, and I understood

16  that Mr. Alivernini, Ms. Black and Mr. Holden are lawyers.  Is

17  that right or not?

18          MR. BUEKER:  As are, your Honor, Kevin Brady and Jason

19  Smith.

20          THE COURT:  So, under the outline that I have given to

21  you about what the protocol has to be for dealing with lawyers

22  in light of the assertion of the attorney-client privilege

23  here, is there anything different about any of those

24  individuals as lawyers here?

25          MR. BUEKER:  No.

1          THE COURT:  All right.  So, you will work together to

2     figure out what it is that you are going to use as the way to

3     refer to these people that does not draw to the attention of

4     the jury that they have legal training in a fashion that will

5     suggest to the jury that they are bringing that legal training

6     to bear on the issues here because of the assertion of the

7     attorney-client privilege.

8          Now, there is also a suggestion here about the time

9     limits, and Wyeth has suggested 30 hours per side on this.  I

10    am not sure, apart from a back-and-forth on this, that that

11    makes sense, "back-and-forth" being efforts to obtain some

12    momentary advantage.  The time period that we are talking about

13    here in this has been very helpful for me to get some better

14    sense, and I suspect for you too, get a better sense of what

15    the course of the trial is going to look like, is this is

16    within the time period.  I have, as you can see, been assisting

17    you in slimming the case down a bit, but I do not see a need

18    for saying they get 30, you get 30.  The Government bears the

19    burden on this, and so I am of the view that they should be

20    permitted to put their case on the way in which the case is

21    outlined here, unless there is something else involved.  A

22    pleasing symmetry appears to be all that you have going for you

23    on that one.

24          MR. BUEKER:  As long as we can stick to this schedule,

25    yes.

1       THE COURT:  There is no reason why we cannot, is

2   there?  Tell me now if there is something that I am going to be

3   surprised by that is going to be introduced in the case.  I

4   look at these third-party witnesses.  They may not be

5   testifying.

6       MR. SHAPIRO:  I think the main thing that's going to

7   be happening is we are going to have fewer witnesses.  Some of

8   them may testify longer than what's on the schedule, but there

9   will be, I think, fewer than --

10      THE COURT:  I think a revision of this list is going

11  to be necessary.  There still may be some issues.  It is not

12  clear who from TAP or AstraZeneca would be testifying here, or

13  if they are going to be testifying in light of the discussions

14  that we have had, but I think I would like a reiteration of

15  this list in light of the discussions we have had now, and I

16  would hope that you will cooperate in a way that you did

17  cooperate on this.  But I am not going to impose 30-minute

18  limitations on it.  It seems to me to fall within that time

19  period.

20      Now, are there other things that we should talk about

21  before I get to the question of the states?  I will make a

22  general observation, which is where I was before, which is that

23  I would like to have this in the form of stipulation, that is,

24  agreement on the part of the parties to be governed by the

25  outcomes in case there is some daylight, I do not believe there

1    really is, but in case there is some daylight between what

2    principles of collateral estoppel would import and what an

3    agreement would be.

4         I have the response from Wyeth which seems generally

5    agreeable to the idea that they are going to be governed by the

6    outcome in this case, tried by the Federal Government, but I

7    want to be sure that this is not an Iran nuclear agreement, so

8    I would like to have it clarified by the parties.

9         Is there going to be any problem with that?

10        MR. BUEKER:  We had offered a stipulation.  It's on

11   the docket at No. 450 in the 2003 case.  The big-picture

12   principles here, your Honor, for Wyeth are we are fine with

13   putting the states to the side for purposes of a trial.  It

14   seems like from the states' submission that there are two major

15   points of agreement, that there is very little additional that

16   would have to go on the verdict form, two questions.  Wyeth can

17   live with that.  And they say any additional evidence that

18   would have to go to a jury by virtue of statutes has to be

19   presented subsequently to that verdict.

20        THE COURT:  Well, let me just raise that, because I

21   really did not look at the stipulation, or proposed

22   stipulation.  I looked just generally to see whether both

23   parties had signed off on something and, more particularly,

24   looked at your response to the submission of the states.

25        There are still kind of what variously could be called

1    "loose threads" or "hangnails" in some of the continued desire

2    of various sovereigns to press their special statutes.  That

3    may be clipped off as the case proceeds.  But it did not look

4    like anything major there.  I do think that there can be a

5    stipulation, and you have called my attention to

6    Document No. 450 in the '03 case.  Is that it?

7         MR. BUEKER:  Yes, your Honor.

8         THE COURT:  So, maybe we can have the states respond

9    to that specifically to get to "Yes" on this issue.

10        Now, let me deal with those things that might come up

11   in a subsequent trial or in this trial.  My own experience --

12   and it is as if the only experience I have is with Fresenius,

13   but that is experience -- is that there will be determinations,

14   if there are damages, with respect to trebling or doubling

15   that, because of the way in which the Tax Division of the

16   Department of Justice works is never compromised during the

17   course of a trial or settlement principally, and I suspect that

18   I would want to have broken out on a jury verdict slip jury

19   determinations about to what degree the damages are

20   compensatory and to what degree they are considered to be

21   punitive, and to avoid having to try another Fresenius case,

22   which is what I had to do over a period of time.

23        So, that gets us into questions of what is the

24   compensatory dimension of this, actual damages, and what is, at

25   least under the Federal False Claims Act, punitive, and I am

1    inclined to think that I want to try that before the first

2    jury, if it comes to that.  I am not deciding that it is going

3    to happen.  I am just trying to deal with that issue here.

4         MR. SHAPIRO:  It's a bit different here, your Honor,

5    because that was a settlement where the allocation was opaque,

6    and here my understanding of what has to happen is that the

7    jury will decide single damages, only single damages, and they

8    will decide the number of false claims, and then the Court will

9    automatically, if there is an award of single damages, the

10   Court will automatically treble that, and also the Court will,

11   with perhaps somewhat more discretion, determine the amount of

12   any penalty based on the number of false claims.  So, the jury

13   would not get into, at least on the federal false claims

14   action, would not get into compensatory versus punitive.

15        THE COURT:  But I would?

16        MR. SHAPIRO:  Maybe on the state claims but not on --

17        THE COURT:  No, but I would on that issue?  Because

18   what is the case -- all of this is trying to get this thing

19   resolved as completely as possible here one way or the other,

20   and so, having been one shot on the question of the obturance

21   of the Tax Division and its evaluation of whether or not a

22   defendant who has been found liable under the False Claims Act,

23   what amount of the money is subject to a business deduction and

24   what is not.  If there is fact-finding going on I want to be

25   sure --

1          MR. SHAPIRO:  It shouldn't happen here.  I'll just

2     clarify one thing, though.  Under the conception, at least that

3     the Government had, based on the Court's statements, is, I am

4     not sure that -- well, yes, the jury would find a total damages

5     amount.  That would go to the Secretary for allocation amongst

6     the states and the Federal Government, but there would be no

7     issue -- the jury would be finding a single damages number, so

8     the <u>Fresenius</u> issue should not happen in this case.

9          THE COURT:  Why?  Why wouldn't it include other kinds

10    of costs that were incurred under these circumstances?  Let's

11    assume that I say, "Here is the basic damage figure."  I treble

12    it.  Are you saying that the basic damage figure is the only

13    compensatory dimension?

14         MR. SHAPIRO:  Yes.

15         THE COURT:  I do not think that is necessarily true.

16    I would have to look at it more carefully, and it may also be

17    other kinds of costs that were associated with the litigation

18    of the case.  I am raising it because if it is to me, that is

19    fine, I can do it, but I just want to be sure that any

20    fact-finding that is necessary is done in a single case.  I am

21    a little concerned about punitive, the state punitive damage

22    stuff being a separate trial.  I am not sure who will have the

23    stamina for that, but that is a different issue.  In any event,

24    that is one of the issues that is on my mind that I would like

25    to have clarified as we move forward on this.

1          MR. SHAPIRO:  Well, we will look at the cost issue and

2     whether there's anything else extraneous.  I think it would be

3     largely immaterial compared to the basic compensatory --

4          THE COURT:  You mean the Government will be waiving

5     it?

6          MR. SHAPIRO:  Perhaps.

7          THE COURT:  Tell the Tax Division, because it is going

8     to be clear on the record what happened if we get to that here.

9          Now, are there other things that we need to talk

10     about?  I think we are advancing on the question of the states'

11     involvement in this.  Frankly, the submissions by the states

12     have been very helpful.  I recognize the death grip that people

13     maintain on their special statutes.  Maybe that will loosen at

14     another stage, but it does not look like there is anything

15     major there that we could force to be resolved here, unless

16     Wyeth has some views about the loose ends and hangnails that

17     were identified.

18          MR. BUEKER:  No.  I mean, the basic principles that

19     are embodied in the stipulation are the states are on the

20     sidelines, and we just want to be clear that we are preserving

21     our rights on appeal.

22          THE COURT:  Sure.

23          MR. BUEKER:  And to the extent there are elements of

24     the state claims that are not satisfied by the evidence --

25          THE COURT:  Well, maybe I should have read that more

1    carefully.  The short of it is I will treat as broadly or as

2    narrowly as necessary the evidence in this case to get as

3    complete a resolution as possible here.  And so, while the

4    State of Connecticut, I think, might think that they have a

5    very interesting statute that has different elements that

6    cannot be adequately addressed here, if that is true, it will

7    not get addressed here.  On the other hand, if Wyeth is going

8    to take a hyper-technical view with respect to elements which,

9    for the most part, are generic, I think -- they have different

10   language, but they are generic -- I would like to know that too

11   so that we can have a what I think in the world of diplomacy is

12   called "full and frank discussion" of that.

13         The short of it is I do not see -- and what I did

14   focus on was the states; I did not focus on your stipulation.

15   Looking at what the states had to say, it struck me as making a

16   lot of sense, except for the hangnails and loose threads, and

17   so I would like to get to that point, and it is why I want a

18   stipulation, so that we all do not get ourselves involved in

19   fascinating litigation over the scope of the doctrines of

20   collateral estoppel.

21         MR. BUEKER:  Understood.

22         MS. ELLIS:  I would recommend that we start afresh.

23   The stipulation that was circulated earlier had extraneous

24   issues not involving now, and you ruled on some of the issues.

25         THE COURT:  Be careful what you ask for.  So, you are

1    going to draft the stipulation --

2          MS. ELLIS:  Be glad to.

3          THE COURT:  -- that reflects the fresh approach.  But

4    it is not going to be just that you are being fresh.  It is

5    going to be that you have taken into consideration everything

6    that people have discussed here, and you will provide it to

7    counsel for Wyeth.  And what time period are we talking about?

8    Because I want to get this straightened away before.

9          MS. ELLIS:  Could we have a week?

10         THE COURT:  Yes.  The 15th is a magic date.

11         MS. ELLIS:  I could feel it coming.

12         THE COURT:  Right.  So, they get the 15th.

13         And I think that they are entitled to a response by

14   you by the following week to kind of get to "Yes."  I will

15   probably ask you, "Do you see big problems, little problems in

16   the stipulation," so we can at least keep our hands on that.

17         I have not dealt with the relators yet.  I still have

18   that under advisement.  But my view is that the core issues, a

19   number of the core issues that the relators would have, are

20   comprehended in this case as well, unless I have got something

21   wrong about that.

22         Verbal expressions are appreciated --

23         MR. BUEKER:  We don't think so, your Honor.

24         THE COURT:  -- but something on the record is helpful,

25   too.  So, we have got that straightened away.

1           So, we have got, I think, a better understanding of

2    where this case is going, at least in front of me, and I will

3    see you on the 19th here.

4           Have I touched on everything that needs to be touched

5    on?

6           We will be in recess.

7           THE CLERK:  All rise.

8        (The Honorable Court exited the courtroom at 11:10 a.m.)

9        (WHEREUPON, the proceedings adjourned at 11:10 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Brenda K. Hancock, RMR, CRR and Official Reporter

4    of the United States District Court, do hereby certify that the

5    foregoing transcript constitutes, to the best of my skill and

6    ability, a true and accurate transcription of my stenotype

7    notes taken in the matter of *United States of America, ex rel*

8    *et al v. Wyeth*, Civil Action Nos. 06-cv-11724 and 03-cv-12366.

9

10

11   Date: January 11, 2015              /s/ *Brenda K. Hancock*
                                          Brenda K. Hancock, RMR, CRR
12                                        Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25