# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. MICHELLE MACKILLOP, | § § § | |
| Plaintiff-Relator | § § | Civil Action No. 18-CV-11192-WGY |
| v. | § § § | |
| GRAND CANYON EDUCATION, INC.; GC EDUCATION INC. F/K/A GRAND CANYON UNIVERSITY, INC.; and GRAND CANYON UNIVERSITY F/K/A GAZELLE UNIVERSITY, | § § § § § § § | |
| Defendants. | § | |

## RELATOR'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>*Page(s)*</u>

**I. RELEVANT STATUTES AND REGULATIONS**...................................................2

    A.  The False Claims Act..................................................................................2
    B.  Requirements of the Tuition Programs ...................................................3
    C.  Incentive Compensation Ban ...................................................................4

**II.  FACTUAL BACKGROUND** .........................................................................5

**III.  STANDARD OF REVIEW** ...........................................................................9

**IV.  ARGUMENT** ...............................................................................................9

    A.  Defendants' ICB violations led to the submission of false claims ...............9
    B.  Defendants' scienter is, at best, a jury question .........................................12
    C.  Defendants' ICB violations are material to payment by the DOE and the VA ..........15

**V.  CONCLUSION**............................................................................................18

# **TABLE OF AUTHORITIES**

***Cases***                                                                                          ***Page(s)***

*Ass'n of Private Sector Colleges & Univs. v. Duncan,*
    681 F.3d 427, 446 (D.D.C. 2012) ........................................................... 14

*Carlson v. Univ. of New Eng.*, 899 F.3d 36, 43 (1st Cir. 2018)......................................9

*Doe v. Trs. of Bos. Coll.,* 892 F.3d 67, 79 (1st Cir. 2018) ...............................................9

*Elliott-Lewis v. Abbott Labs., Inc.,*
    411 F. Supp. 3d 195, 205 (D. Mass. Nov. 6, 2019) ...................................9

*Janeiro v. Urological Surgery Prof'l Ass'n,*
    457 F.3d 130, 140 (1st Cir. 2006) ..........................................................12

*Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 87 (1st Cir. 2018).....................9

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)................................................13, 14

*Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004) ......................................................9

*SEC v. Present*, 2017 U.S. Dist. LEXIS 120351 ......................................................... 12

*Theriault v. Genesis Healthcare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) ......................9

*United States ex rel. Atkins v. McInteer,*
    470 F.3d 1350, 1360 n. 17 (11th Cir. 2006) ............................................18

*United States ex rel. Booker v. Pfizer, Inc.,*
    847 F.3d 52 (1st Cir. 2017)......................................................................11

*United States ex rel. Chandler v. Cook County, Illinois,*
    277 F.3d 969, 974 n.5 (7th Cir. 2002) ....................................................18

*United States ex re. Escobar v. Universal Health Servs. ("Escobar I")*
    842 F.3d 103 (1st Cir. 2016).....................................................................16

*United States v. Ctr. for Emp. Training*, No. 2:13cv01697,
    2019 WL 424189, (E.D. Cal. Feb. 4, 2019)..............................................

*United States v. Gen. Hosp. Corp.*, 394 F. Supp. 3d 174, 189 (D. Mass. 2019)............17

*United States ex rel. Lee v. Corinthian Colleges,*
    655 F.3d 984 (9th Cir. 2011) ...................................................................10

*United States v. Powers*, 702 F.3d 1, 9 (1st Cir. 2012)................................................................12

*United States ex rel. Prather v. Brookdale*, 892 F.3d 822, 836 (6th Cir. 2018) ............................18

*United States ex rel. Rose v. Stephens Inst.*,
    909 F.3d 1012, 1017 (9th Cir. 2018) ................................................................4, 10, 11, 15, 16

*United States v. Sanford-Brown, Ltd.*,
    840 F.3d 445 (7th Cir. 2016) ........................................................................................................11

*United States ex rel. Savage v. CH2M Hill Plateau Remediation Co.*,
    2021 U.S. Dist. LEXIS 42396 (E.D. Wash. Jan. 11, 2021) ........................................................18

*United States ex rel. Schutte v. SuperValu Inc.*,
    9 F.4th 455 (7th Cir. 2021) ...................................................................................................13, 14

*United States ex rel. Ubl v. IIF Data Solutions*,
    650 F.3d 445, 457 (4th Cir. 2011) ..............................................................................................18

*United States v. Univ. of Phx.*,
    461 F.3d 1166, 1175-77 (9th Cir. 2006) ........................................................................15, 16, 17

*United States ex rel. Whatley v. Eastwick Coll.*,
    2015 U.S. Dist. LEXIS 95862 (D.N.J. July 23, 2015)................................................................11

*United States ex rel. Williams v. City of Brockton*, No. 12-cv-12193-IT,
    2016 U.S. Dist. LEXIS 178032, (D. Mass. Dec. 23, 2016)........................................................17

*Universal Health Services, Inc. v. United States ("Escobar II")*,
    136 S. Ct. 1989 (2016)........................................................................................................10, 17

*United States ex rel. Urquilla-Diaz v. Kaplan Univ.*,
    2017 U.S. Dist. LEXIS 108273 (S.D. Fla. July 13, 2017)..........................................................13

**_Other_**                                                                                    **_Page(s)_**

20 U.S.C. § 1070.............................................................................................................................3

20 U.S.C. § 1094.........................................................................................................3, 4, 14, 15, 17

31 U.S.C. § 3729.............................................................................................................................2

38 U.S.C. § 3311.............................................................................................................................3

38 U.S.C. § 3685 ................................................................................................15

38 U.S.C. § 3690 ................................................................................................15

38 U.S.C. § 3696 ................................................................................................15

32 C.F.R. § 68.4 ...................................................................................................3

34 C.F.R. § 668.13 ...............................................................................................3

34 C.F.R. § 668.14 .......................................................................3, 4, 14, 15, 17

38 C.F.R. § 21.4210 ...........................................................................................15

75 Fed. Reg. 66832 ..............................................................................................4

80 Fed. Reg. 73991 .................................................................................5, 14, 16

Fed. R. Civ. P. 56(c) ............................................................................................9

S. Rep. 99-345, *reprinted in* 1986 U.S.C.C.A.N. 5266 ................................2

The Court should deny Defendants' Motion for Summary Judgment because the evidence shows that Defendants violated the Incentive Compensation Ban ("ICB"), and thus violated the False Claims Act ("FCA"), by engaging in a scheme to give increased compensation to Counselors who met Defendants' enrollment quotas.[1] Defendants had "Compensation Plans" pursuant to which they awarded promotions and increased compensation, purportedly based solely on Counselors' tenure. At the same time, however, they had "Job Expectations" that required Counselors to meet enrollment quotas in order to achieve tenure markers (*i.e.*, points of tenure that came with a promotion, increased salary, as well as higher enrollment quotas). Defendants conditioned promotions and pay raises on Counselors accepting higher enrollment quotas.

Defendants' outside counsel advised them to not link enrollment quotas to promotions and salaries. Defendants abided by this advice only in form, not substance: In form, they separated the Compensation Plan and Job Expectations into two documents. In substance, Defendants promoted Counselors and gave them raises, but only when the Counselors became subject to higher enrollment quotas. Thus, Defendants based their compensation plan not just on tenure; they also based it, in the words of the ICB, "directly or indirectly on success in securing enrollments." 20 U.S.C. § 1094(a)(20).

Defendants' outside counsel also cautioned that the United States Department of Education ("DOE") guidance warned against linking course completions to compensation and that doing so would violate the ICB. Defendants ignored the advice, however, and based the enrollment quotas in the Job Expectations on first-course-completions.

---

[1] "Enrollment quotas" means: (a) enrollment starts, *i.e.*, the number of students who enroll with Defendants; and (b) first-course-completions, *i.e.*, the number of students who complete their first course with Defendants. "Counselors" means, collectively, University Counselor ("UCs," f/k/a Enrollment Counselors) and University Development Counselors (f/k/a University Development Representatives).

Defendants also concealed their compensation practices from the Government. For example, when requested, they provided only the Compensation Plan, but not the Job Expectations, to the DOE. And, despite tying enrollment quotas to salary increases, Defendants routinely certified that they complied with the ICB, thus enabling their continued receipt of funding from federal student financial aid programs under false pretenses.

## I.    RELEVANT STATUTES AND REGULATIONS

### A.    The False Claims Act

The FCA, 31 U.S.C. § 3729 *et seq.*, imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim. It is the primary remedial statute designed to deter fraud upon the United States and reflects Congress's intent to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. 99-345 at 1, *reprinted in* 1986 U.S.C.C.A.N. 5266.

Under the FCA, the terms "knowing" and "knowingly" encompass both actual knowledge and deliberate ignorance or reckless disregard of the truth or falsity of information. 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1). A "claim" includes any request or demand for money or property that is made to the United States, as well as any request or demand for money or property that is made to a party that spends money or uses property on the Government's behalf. 31 U.S.C. § 3729(b)(2). The term "material" means that a false claim or statement has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**B.**     **Requirements of the Tuition Programs[2]**

DOE's Title IV Tuition Programs provide financial assistance to eligible students at participating institutions to help defray the costs of education. In order to participate, an institution must enter into a Program Participation Agreement ("PPA"). 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a)(1). The PPA expressly condition the initial and continuing eligibility of an institution to participate in a Tuition Program upon compliance with, *inter alia*, the requirements of the ICB. 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14.(a)(1), (b)(22). Thus, to maintain their status as an "eligible" institution or program, Defendants must comply with the ICB. (*Id.*; RRAF at Ex. 1; Doc. 39-2.)[3]  Each PPA allows an institution to participate in Title IV Tuition Programs for a maximum of six years, but institutions are required to seek recertification from DOE on a regular basis in order to continue their participation in those Programs. 34 C.F.R. § 668.13(b).

Separately, the United States Department of Veterans Affairs ("VA") administers Tuition Programs for veterans. 38 U.S.C. § 3311 *et seq.*[4] The statute governing the VA Tuition Programs mirrors Title IV's ICB. 38 U.S.C. § 3696(c). So, post-secondary institutions must comply with the ICB in order for their students to be eligible to receive financial aid under the VA Tuition Programs.

---

[2]     "Tuition Programs" refers to (a) DOE-administered federal financial aid programs under Title IV of the of the Higher Education Act of 1965 ("Title IV"), as amended, 20 U.S.C. § 1070 *et seq.*; and (b) VA education benefit programs, as set forth in 38 U.S.C. § 3311 *et seq.*

[3]     "RRAF" refers to Relator's Response to Defendants' Statement of Undisputed Facts, and Statement of Additional Facts (Doc. 160.)

[4]     While the VA oversees Tuition Programs for veterans, the Department of Defense oversees Tuition Programs for active military personnel, the National Guard, and Reservists. *See* 32 C.F.R. §68.4, Appendix A (discussing Tuition Assistance program for United States service members and Memorandum of Understanding that governs the program).

C.    **Incentive Compensation Ban**

"The [DOE] oversees the grant of [Title IV] funds to colleges and universities. To qualify for such funds, schools must comply with a number of statutory, regulatory, and contractual requirements. One such requirement is the [ICB], which is mandated by statute, regulation, and contractual program participation agreements." *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017 (9th Cir. 2018). "The [ICB] prohibits schools from rewarding admissions officers for enrolling higher numbers of students." *Id.* at 1016. Specifically, the ICB prohibits institutions of higher education from:

> provid[ing] any commission, bonus, or other incentive payment **based directly or indirectly** on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance…"

20 U.S.C. § 1094(a)(20) (emphasis added). *Accord* 34 C.F.R. § 668.14(b)(22)(i)(directing that payments may not be "based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid").

In promulgating its 2010 ICB regulations, DOE explained that institutions "remain free to promote and demote recruitment personnel, as long as these decisions are consistent with the [ICB]." 75 Fed. Reg. 66832, 66876 (Oct. 29, 2010). DOE further observed that, in making merit-based adjustments to employee compensation, "[a]n institution may use a variety of standard evaluative factors," but "**may not** consider the employee's success in securing student enrollments or the award of financial aid in providing this type of compensation." *Id.* at 66877 (emphasis added). In 2015, DOE elaborated that:

> [i]n assessing the legality of a compensation structure, **[DOE] will focus on the substance of the structure rather than on the label given the structure by an institution**…[DOE] reserves the right to take enforcement action against institutions if compensation labeled by an institution as graduation-based or completion-based compensation is **merely a guise for enrollment-based**

4

**compensation, which is prohibited. Compensation that is based upon success in securing enrollments, even if one or more other permissible factors are also considered, remains prohibited.**

80 Fed. Reg. 73991, 73992 (Nov. 27, 2015) (emphasis added). Thus, institutions like Defendants may make merit-based adjustments to an ICB-covered Counselor's compensation and benefits, but only so long as those adjustments have no connection whatsoever to the Counselor's success in securing enrollments or the award of financial aid.

## II.   FACTUAL BACKGROUND

Notwithstanding their superficial attempts to make it appear otherwise, Defendants linked Counselors'[5] promotions and corresponding salary increases to their success in securing student enrollments. In or about 2016, Defendants began drafting a compensation plan that included tenure markers (*i.e.*, points at which Counselors could receive promotions and raises) and enrollment quotas (required to achieve the promotions/raises). (RRAF at Exs. 17 at 27:20-28:19, 60.) Defendants took the draft plan to their outside counsel, Blain Butner ("Butner"), who reviewed it and informed them that using enrollment quotas to determine Counselor compensation would violate the ICB. (*Id.* at Ex. 60.) Butner suggested that Defendants untie any suggestion of enrollment quotas from their compensation plan. (*Id.*)

Defendants reacted to Butner's advice not by actually untying enrollment quotas from promotions and salary increases, but instead by simply dividing their one draft document into two documents. (*Id.*) One was titled "Compensation Plan" ("Comp Plan"), and it set out the tenure markers for certain lower levels of Counselors (*i.e.*, levels 1-4). (*Id.* at Ex. 27.) Under this plan, when a Counselor hit a tenure marker, s/he was promoted and given an increased salary, and, in

---

[5]     Defendants' motion addresses only UCs and UDCs, so that is what Relator's Opposition discusses. *See* Doc. 153. Relator's allegations—and the evidence for the jury—apply to other positions (*e.g.*, Student Services Counselors), as well. (*See, e.g.,* Doc. 141 at ¶¶ 69-73.)

return, was required to accept a higher enrollment quota. (*Id.* at ¶ 19.) The other document was titled "Job Expectations," and it set out enrollment quotas. (*Id.* at Ex. 11.) Defendants used the two documents together: If Counselors hit their enrollment quotas, they were able to make their tenure markers and receive promotions and raises. (*Id.* at Ex. 6 at 69:12-24, 71:19-24. *See also* Doc. 51-1.) In short, the promotion and salary increase also came with a corresponding increase in enrollment quotas; no other additional duties were imposed. (RRAF at ¶ 19.)

Pursuant to the Job Expectations, Counselors had to satisfy both monthly and annual enrollment quotas (referred to in the document as "student counts"). The "Annual Student Counts equate to the number of new students who successfully complete the first course of their degree program [*i.e.,* first-course-completions.]." (*Id.* at Exs. 11 at pp. 3-4; 34 at pp. 3-4.) The Annual Student Count quotas increased for each level of Counselor. (*Id.*) Per the Job Expectations, to determine a Counselor's Annual Student Count, Defendants looked at first-course-completions on a 90-day rolling basis. (*Id.*) Managers monitored Counselors' satisfaction of monthly quotas, and they tracked Counselors' student enrollments on a rolling basis. (*Id.* at Ex. 29.)

In advising Defendants, Butner highlighted that quotas for first-course-completions would be viewed as an ICB violation, noting in an email to GCE's in-house attorney:

> I am curious about your second sentence below, that GCU measures employee performance based on 1st and 2nd course completions. Recall that the incentive compensation law and regulations do not allow compensation to be based on securing enrollments, which [DOE] defines as students matriculating for any period of time, up to completion of their program…so just as an institution may not compensate an admissions employee based on the number of students he enrolls, **it also may not compensate such an employee based on the number he enrolls who complete a course, two courses, or a year, etc. (anything less than full program completion).**

(*Id.* at Ex. 35, emphasis added) (*See also id.* at Ex. 36.) But Defendants ignored this admonition and included first-course-completion quotas in their Job Expectations. (*Id.* at Exs. 11 at pp. 3-4; 34 at pp. 3-4.)

As one former Counselor observed:

The arrangement was, essentially, that at each year of experience, Grand Canyon offered Counselors additional money in exchange for additional enrollments. Grand Canyon purported to have additional [non-enrollment] requirements for each level, but these were disingenuous at best—the difference was the enrollment quota, and the increased pay was for additional student enrollments.

(*Id.* at Ex. 13 ¶ 20.) (*See also id.* at Ex. 10 at ¶ 10.) Defendants' other purported means measuring Counselors' performance were just pretense: Whether a Counselor was hitting his/her enrollment quota was all that mattered to receive a promotion and salary increase. (*Id.* at Exs. 14 ¶ 9; 8 ¶ 7.)

Over time, Defendants added higher Counselor compensation levels (*i.e.*, levels 5-6) and abandoned all pretense that promotion to these levels was tenure-based. (*Id.* at ¶ 19.) Instead, Defendants compensated Counselors at levels 5 and 6 only if the Counselors agreed to higher enrollment quotas. (*Id.* at ¶¶ 19, 88-93.)[6]

Defendants used the Comp Plan and Job Expectations together when making compensation decisions. The communications of Defendants' managers, for example, show that they discussed promotions/raises alongside enrollment quotas.[7] (*Id.* at Exs. 24, 25.) Similarly, Defendants put Counselors on a Corrective Action Process ("CAP") when they did not hit their enrollment quotas,

---

[6]     Counselors at level 5 and above could choose whether to accept the promotion, salary increase, and the resulting enrollment quota increase. (*Id.* at Exs. 11, 27.) Many declined the extra money because of the onerous quotas. (*See id.* at Ex. 8 ¶ 8.)

[7]     While there may be examples where the Job Expectations were not enforced, that was the exception. Indeed, Defendants' data reveals a statistically significant correlation between a Counselor satisfying enrollment quotas and being promoted/receiving a raise. (*Id.* at ¶¶ 73-78; Ex. 33 at pp. 3-4.)

and the CAP template instructed Counselors to "achieve your required annual student count *per the UC Comp Plan* [which incorporated the Job Expectations]." (*Id.* at 29.)

Defendants did not obtain nor follow legal advice for the actual conduct at issue. First, they *did not* seek advice from their outside counsel (*i.e.*, Mr. Butner or Dennis Cariello) about the manner in which they actually implemented the plan.  (*Id.* at Exs 17 at 87:12-24; 30 at 88:7-9.) Second, Defendants did not heed their counsel's warning not to use first-course-completion quotas as a basis for making compensation decisions. (*Id.* at ¶ 47.)

All the while, Defendants continued to certify, falsely, to DOE and VA that they were ICB-compliant. (*Id.* at ¶¶ 168.)  Brian Mueller, the President of Grand Canyon University ("GCU") and Chief Executive Officer of Grand Canyon Education, Inc. ("GCE"), signed the PPAs on behalf of Defendants. (*Id.*) When DOE asked Defendants to produce documents reflecting their compensation practices, they produced only the Comp Plan and failed to disclose the Job Expectations that the Comp Plan incorporated by reference. (*Id.* at ¶¶ 80-85.) As a result, even though Defendants were knowingly violating the ICB, they managed to continue receiving billions of dollars from DOE and VA under the Tuition Programs combined. (*Id.* at ¶¶ 109-118.)[8]

Defendants similarly withheld documents from Weworski and Associates ("Weworski"), the third-party auditor that Defendants hired to look at their general Title IV compliance. (*Id. at* ¶ 68.) Weworski relied only on documents that were provided by Defendants, and Defendants never provided Weworski with their many CAPs reflecting their student enrollment quotas tied to promotions and pay increases. (*Id.*) Thus, Weworski did not have all material information concerning Defendants' compensation practices. (*Id.*)

---

[8]     Pursuant to a Master Services Agreement between the Defendants, GCU paid 60% of its revenue to GCE. (*Id.* at ¶ 109; Ex. 3 at 16:4-17.) Thus, increased revenue for GCU meant increased revenue for GCE.

III.   **STANDARD OF REVIEW**

Summary judgment is appropriate only where the evidence shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004); *Elliott-Lewis v. Abbott Labs., Inc.*, 411 F.Supp.3d 195, 205 (D. Mass. Nov. 6, 2019). A genuine issue exists where the evidence "is such that a reasonable jury could resolve the point in favor of the non-moving party." *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 87 (1st Cir. 2018) (quotation omitted). A material fact is one that has the potential of changing a case's outcome. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018). In determining whether to grant a motion for summary judgment, "[t]he court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." *Carlson v. Univ. of New Eng.*, 899 F.3d 36, 43 (1st Cir. 2018). A court must deny summary judgment "if the nonmoving party adduces competent evidence demonstrating the existence of a genuine dispute about a material fact." *Theriault v. Genesis Healthcare LLC*, 890 F.3d 342, 348 (1st Cir. 2018).

IV.   **ARGUMENT**

A.   **Defendants' ICB violations led to the submission of false claims.**

As discussed *supra*, Defendants impermissibly tied promotions and salary increases to tenure markers that came with promotions and pay increases. (*See* RRAF at Exs. 10 ¶ 10; 6 at 71:19-24; 33 at pp. 3-4, 29-30.) Although Defendants purported to give promotions based only on tenure, employees who received promotions, and concomitant compensation increases, also became subject to increased enrollment quotas. (*Id.* at Exs 11, 27, 31, 34; ¶¶ 19, 36.) Thus, Defendants inextricably linked promotions and compensation increases to enrollment quotas,

thereby violating the ICB and resulting in the submission of false claims. 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i).

While continuously violating the ICB, Defendants executed PPAs that falsely certified their compliance with the ICB. (RRAF at ¶ 168.) These false PPA certifications allowed Defendants to participate in, and receive payment under, Title IV and VA Tuition Programs. (*Id.*) Had DOE or the VA known that Defendants were violating the ICB, they would not have paid money to Defendants under the Tuition Programs. (*Id.* at ¶ 168; Exs. 66, 67.) Thus, Defendants' false PPA certifications caused the submission of false claims. *See Universal Health Services, Inc. v. United States*, 136 S.Ct. 1989, 1995 (2016) (*"Escobar I"*) (failure to disclose "violation of a material statutory, regulatory, or contractual requirement" is a "misrepresentation that renders [a] claim 'false or fraudulent'"); *Stephens Inst.*, 909 F.3d at 1018 ("misleading half-truths" in PPAs can establish false claims).

Defendants rely on *United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011), for the proposition that the ICB does not prohibit employee terminations based on failure to meet enrollment quotas, but *Corinthian* provides no cover for what Defendants actually did, which was to link compensation to enrollment quotas. In *Corinthian*, the court held that "adverse employment actions, including termination, on the basis of recruitment numbers remain permissible under the statute's terms." *Id.* at 992-93. At the same time, however, the court refused to dismiss the claims against Corinthian because the institution allegedly "awards salary increases on the basis of recruitment numbers." *Id.* at 993. In substance, that is exactly what Defendants did: They provided increased compensation to Counselors only if they continued to comply with the

Job Expectations, which contained enrollment quotas. (RRAF at ¶ 19.) Even under *Corinthian*, then, Defendants' practices clearly violated the ICB.[9]

Furthermore, unlike the relator in *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016), Relator has presented evidence that Defendants made false representations. In *Sanford-Brown*, the court held that the relator could not survive summary judgment because he "offered no evidence that defendant Sanford-Brown College [] made any representations at all in connection with its claims for payment, much less false or misleading representations." *Id.* at 447. Here, by contrast, Relator has presented evidence that Defendants repeatedly submitted PPAs with false representations that they were complying with the ICB. (RRAF at ¶ 168.) *See Stephens Inst.*, 909 F.3d at 1020 ("Had Defendant not certified in its program participation agreement that it complied with the incentive compensation ban, it could not have been paid, because Congress required as much.").[10] Defendants caused the submission of claims made false by Defendants' false PPA certifications. Defendants' false PPAs allowed them to participate in and get paid under Title IV and VA Tuition Programs, all while violating the ICB.

---

[9]     Defendants' reliance on *United States ex rel. Whatley v. Eastwick Coll.*, 2015 U.S. Dist. LEXIS 95862 (D.N.J. July 23, 2015), is also inapt. *Whatley* does not stand for the proposition that the ICB permits linking incentives (*i.e.*, promotions and increased pay) to enrollment quotas. The court merely held that the relator in that case did not plead the violation with enough specificity to satisfy F.R.C.P. 9(b). *Id.* at *18.

[10]     Defendants' quote of dicta in *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52 (1st Cir. 2017)—that summary judgment is the "put up or shut up moment in litigation"—provides a soundbite, but no support for Defendants' arguments. As discussed *supra* and in the accompanying RRAF, the evidence demonstrates that Defendants caused the submission of false claims by executing PPAs in which they falsely certify compliance with the ICB.

B.    **Defendants' scienter is, at best, a jury question.**

Defendants base their scienter arguments on an advice of counsel defense, but they neither fully informed their attorneys of all relevant facts nor fully followed their attorneys' advice. Consequently, they cannot avail themselves of the shield of their attorneys.

"The defense of good-faith reliance on advice [of counsel] is not available to one who omits to disclose material information to advisors or dictates imprudent outcomes to advisors." *Janeiro v. Urological Surgery Prof'l Ass'n*, 457 F.3d 130, 140 (1st Cir. 2006). *See also United States v. Powers*, 702 F.3d 1, 9 (1st Cir. 2012) (quoting *Janeiro*, 457 F.3d at 140); *SEC v. Present*, No. 14-cv-14692, 2017 U.S. Dist. LEXIS 120351 at *2 (D. Mass. Jul. 21, 2017) (reciting elements of advice-of-counsel defense).

Defendants did not provide their attorneys with all material information about their compensation practices. They did not tell them that they were using the enrollment quotas—including first-course-completion metrics—in the Job Expectations in conjunction with the Comp Plan, so that promotions and salary increases were only achieved with acceptance of higher enrollment quotas. (RRAF at Exs 11, 27, 31, 34; ¶¶ 19, 36.) They sought counsel's advice only to make the Comp Plan appear, on paper, compliant with the ICB. (*Id.* at 30 at 132:6-8.) They did not seek advice about the legality of linking promotions and pay increases to enrollment quotas contained in a Job Expectations document that Defendants hid from the Government. (*Id.* at Exs. 11, 34, 77; Doc. 51-1.)

Defendants' own attorney acknowledged that, even if a document appeared ICB-compliant on its face, its implementation could result in an ICB violation. (RRAF at Ex. 30 at 72:9-13.) Defendants' attorneys were not involved in implementation of Defendants' compensation

practices, and thus never opined on what Defendants actually did. (*Id.* at Exs. 17 at 87:7-24, 90:9-16; 30 at 41:23-42:15.)

Moreover, the evidence shows that Defendants did not follow their attorneys' advice. They used first-course-completions as an enrollment quota metric, even though counsel advised that doing so was an ICB violation. (*Id.* at ¶¶ 47, 50.)

Defendants also do not meet the four factors on which the court focused in *United States ex rel. Urquilla-Diaz v. Kaplan Univ.*, No. 09cv20756, 2017 U.S. Dist. LEXIS 108273 (S.D. Fla. July 13, 2017). The *Urquilla-Diaz* court found that the relator could not prove scienter because: (1) the defendant relied on advice of counsel, (2) the defendant believed it was compliant, (3) DOE did not raise any non-compliance issues, and (4) Title IV audits did not alert the defendant to ICB violations. *Id.* at *28-29. Here, Brian Mueller, President of GCU and CEO of GCE, rejected counsel's advice to create a graduation-based compensation plan and instead chose to compensate counselors based on first-course completions. (RRAF at Exs. 17 at 101:15-17, 104:17-105:25; 18 at 0000034.) Furthermore, by withholding the Job Expectations document, Defendants did not disclose all material information to DOE and the VA. (*Id.* at ¶¶ 80-85.) Similarly, they withheld from their auditors the CAPs that showed Defendants' insistence on Counselors' meeting enrollment quotas. (*Id.* at ¶ 68.) As a result, neither the DOE, the VA, nor Weworski had complete information when assessing whether Defendants' compensation practices complied with the ICB. Defendants therefore fail to meet the first, third, and fourth *Urquilla-Diaz* factors, and their litigation-created belief in compliance cannot remotely create lack of scienter entitling them to judgment as a matter of law.

Finally, Defendants' conduct was not "objectively reasonable." *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 n.20 (2007); *United States ex rel. Schutte v. SuperValu, Inc.*, 9 F.4th

455, 465 (7th Cir. 2021). In *Safeco*, the Supreme Court found that the petitioner's interpretation of a statutory provision of the Fair Credit Reporting Act was "objectively reasonable" and did not establish "reckless disregard" because the "reading ha[d] a foundation in the statutory text," and the petitioner did not have the benefit of guidance from the courts of appeals or the agency that might have warned it away from the view it took. 551 U.S. at 69-70. In *SuperValu*, the court applied *Safeco* in the FCA context, but cautioned that, "[u]nder *Safeco*, an objectively reasonable interpretation of a statute or regulation does not shield a defendant from liability if authoritative guidance warned the defendant away from that interpretation."[11] 9 F.4th at 465.

Safeco provides no shelter for Defendants: Quite unlike the then-nascent FCRA, the ICB's text plainly barred the incentive-based compensation structure that Defendants implemented; the implementing regulations were equally clear; and the agency's guidance on the ICB was unequivocal. *See* 20 U.S.C. § 1094(a)(20) (prohibiting compensation "based *directly or indirectly* on success in securing enrollments") (emphasis added); 34 C.F.R. § 668.14(b)(22)(i) (same); 80 Fed. Reg. at 73991, at 73992. DOE specifically warning that it would "focus on the substance of" of a compensation plan and that institutions should not implement a plan that is "merely a guise for enrollment-based compensation, which is prohibited"). *See also Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 446 (D.D.C. 2012) (recognizing DOE's long-standing prohibition on schools linking salary and recruiting numbers and DOE's willingness to sanction schools "for using [purportedly neutral job-performance] factors to *hide their true compensation practices*") (emphasis in original).

---

[11]     The First Circuit has not applied *Safeco* to the FCA. While Relators urge that the dissent by Judge Hamilton in *SuperValu* more accurately reflects the proper application of the FCA in such circumstances, the facts in this case prevail under even the most conservative application of *SuperValu* in this jurisdiction.

Defendants knew of these prohibitions. (RRAF at Exs 1 at 106:15-107:14; 9 at 59:3-16; 16 at 19:22-20:9; 17 at 101:15-17; 30 at 53:5-10, 119:11-120:12.) This is not surprising; as Defendants' own attorneys acknowledge, education is a heavily-regulated field. (*Id.* at Ex. 17 at 15:11-19.)

In sum, Defendants knew the rules, and tried to use their attorneys to skirt them. The evidence shows that, all along, they intended to condition increased compensation on satisfaction of enrollment quotas, and that, in contravention of their attorneys' advice, they implemented a compensation structure that achieved their illegal aims.

### C.    Defendants' ICB violations are material to payment by the DOE and the VA.

Defendants' ICB compliance is a material condition of payment under the DOE and VA Tuition Programs. The ICB and its implementing regulations clearly prohibit compensation practices, like Defendants', that tie enrollment quotas to promotions and salary increases. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a)(1); 38 U.S.C. §§ 3685, 3690, 3696; *see also* 38 C.F.R. § 21.4210(d)-(f). The PPAs that Defendants routinely executed also stated that ICB compliance is material to payment. (RRAF at 1 at 112:18-113:1; Doc. 39-2.) The caselaw supports the materiality of ICB violations to payment under Tuition Programs. *See Stephens Inst.*, 909 F.3d at 1020 (holding that conditioning of Title IV funds on compliance with the ICB "is certainly probative evidence of materiality");[12] *United States v. Univ. of Phx.*, 461 F.3d 1166, 1175-77 (9th Cir. 2006)(holding that the ICB is a "regulation upon which payment is expressly conditioned" because

---

[12]    In *Stephens Inst.*, the court held that fines levied against two institutions and DOE settlement agreements with 22 other institutions were evidence that "[DOE] *did* care about violations of the [ICB] and did not allow schools simply to continue violating the ban while receiving Title IV funds." 909 F.3d at 1021-22 (emphasis in original). Because DOE "recoup[s] many millions of dollars from the violating schools[,]" the court found it clear that the agency was "not prepared to pay claims 'in full' despite knowing of violations of the [ICB]." *Id.*

the requirement is codified in the statute and regulations, and set forth in the mandatory PPAs).[13] And DOE and VA have declared that ICB compliance is a material condition of payment. (RRAF at Exs. 66 ¶¶ 4-5; 67 ¶ 3.) Defendants thus had ample notice that ICB compliance was a material condition of payment under the Tuition Programs.

The *Escobar* decisions from the Supreme Court and First Circuit govern the inquiry into whether a statutory or regulatory requirement—such as compliance with the ICB and related regulations—is material to a condition of payment under a Government program. *Escobar I*, 136 S.Ct. 1989; *United States ex rel. Escobar v. Universal Health Servs*. ("*Escobar II*"), 842 F.3d 103 (1st Cir. 2016). Courts are to "conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive." *Escobar II*, 842 F.3d at 109 (1st Cir. 2016).

One factor that can contribute to a materiality determination is "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar II*, 842 F.3d at 110 (quoting *Escobar I*, 136 S.Ct. at 2003). Here, Defendants knew that ICB compliance was required to get paid under Tuition Programs. Defendants executives acknowledged it. (RRAF Exs 1 at 106:15-107:14; 9 at 59:3-16; 16 at 19:22-20:9; 17 at 101:15-17; 30 at 53:5-10, 119:11-120:12.) Defendants' President/CEO signed PPAs certifying that Defendants understood that ICB compliance was required. (*Id.* at Ex. 168.) Their attorneys told them. (*Id.*) The caselaw is consistent on the point, as are the statutory provision itself, its implementing regulations, and agency guidance. *See Stephens Inst*., 909 F.3d at 1020-22; *United*

---

[13]   Indeed, DOE has taken action on several occasions when it has discovered ICB violations. (RRAF at Ex. 67 ¶ 4, Ex. A.) It has, *inter alia*, levied $171,500 in fines against six institutions and secured 106 settlements (including with GCU) totaling $1,293,525,752. *Id.*

*States v. Univ. of Phx.*, 461 F.3d at 1175-77; 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i); 80 Fed. Reg. 73991, at 73992.

     While Government knowledge is often a factor in that analysis, it should not be here, as the evidence shows that Defendants hid their ICB violations from the Government. Defendants provided DOE only with their Comp Plan, even though Defendants knew that the Job Expectations (with their attendant enrollment quotas) were also implicated when Counselors received promotions and increased compensation. (RRAF at ¶¶ 80-85.) Without the Job Expectations document, the Government could not have discerned that each salary increase in the Compensation Plan was in lockstep with an increase in student enrollment quotas. (*Id.* at Exs 11, 27, 31, 34.) Indeed, DOE and VA affirmed that they were not aware of Defendants' ICB violations and that such violations are material conditions of payment. (*Id.* at ¶¶ 80-85.)

     Even if the Government had been aware of allegations of Defendants' noncompliance with the ICB, such awareness is not dispositive on the issue of materiality. *See Escobar II*, 842 F.3d at 112 (holding that notice of allegations did not allow the Government to "conclusively discover the extent of the violations," which would be necessary to support a finding of "knowledge of actual noncompliance"); *United States ex rel. Williams v. City of Brockton*, No. 12-cv-12193-IT, 2016 U.S. Dist. LEXIS 178032, at *17 (D. Mass. Dec. 23, 2016) (actual knowledge of noncompliance "is not determinative in the court's holistic review of materiality"). (*See* Doc 62 at 8-10.) Continued payment of claims is likewise not dispositive. *United States v. Gen. Hosp. Corp.*, 394 F. Supp. 3d 174, 189 (D. Mass. 2019) (citing *Escobar II* and holding that "whether the government paid out a particular claim despite actual knowledge that the supposedly material requirements had been violated" is "non-dispositive" of materiality). (*See* Doc 62 at 8-10.)

Finally, the Government's decision not to intervene in this matter has no bearing on whether Defendants' ICB violations rendered their claims to DOE and VA materially false. Courts have made clear that the Government's decision not to intervene in a *qui tam* action should not be construed as a reflection on the merits of an FCA claim. *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 836 (6th Cir. 2018) (finding that FCA's purposes would be undermined if "the element of materiality were stymied by the government's choice not to intervene"); *United States ex rel. Chandler v. Cook County, Illinois*, 277 F.3d 969, 974 n.5 (7th Cir. 2002), *aff'd*, 538 U.S. 119, 123 (2003) (finding no reason to presume that Government's declination is a commentary on the merits of an FCA matter); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n. 17 (11th Cir. 2006) (same); *United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 457 (4th Cir. 2011) (same).[14]

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Relator respectfully requests that the Court deny Defendants' motion for summary judgment.

Respectfully submitted,

<u>/s/ Sonya A. Rao</u>

Christopher R. O'Hara                              J. Marc Vezina, Esq. (pro hac vice)
Massachusetts BBO #548611                   Michigan – P76232
Lucia A. Passanisi                                      Texas – 24000141
Massachusetts BBO #691189                   Louisiana – 24683
TODD & WELD LLP                                  Georgia - 465449
One Federal Street, 27th Floor                 Kelli M. Khalaf (pro hac vice)
Boston, MA 02110                                     Louisiana – 23213

---

[14]   *See United States ex rel. Savage v. CH2M Hill Plateau Remediation Co.*, 2021 U.S. Dist. LEXIS 42396 at *3 (E.D. Wash. Jan. 11, 2021) (precluding evidence at trial of Government's non-intervention because such evidence is irrelevant and highly prejudicial because it could allow a jury to draw the inference that Relator's claim is substantively weak); Doc. 24 (discussed inability to make intervention at least in part due to Defendants' own dilatory production practices); Doc. 62 at 6-7.)

(617)720-2626
cohara@toddweld.com
lpassanisi@toddweld.com

Jeffrey A. Newman, Esq.
Massachusetts BBO # 370450
JEFFREY NEWMAN LAW
One Story Terrace
Marblehead, MA 01945
(617)823-3217 (Telephone)
(781)639-8688 (Facsimile)
jeffrey.newman1@gmail.com

Frederick M. Morgan, Jr. (pro hac vice)
Ohio Bar No. 0027687
Sonya A. Rao
Massachusetts BBO #647170
Jonathan M. Lischak (pro hac vice)
Ohio Bar No. 0097669
Morgan Verkamp LLC
35 East Seventh Street, Suite 600
Cincinnati, Ohio 45202
rick.morgan@morganverkamp.com
sonya.rao@morganverkamp.com
jonathan.lischak@morganverkamp.com

VEZINA LAW GROUP
18 So. Broadway Street
Suite 200
Lake Orion, MI 48362
(248)558-2701 (direct)
(248)232-1581 (fax)
jmv@vezinalaw.com
kkhalaf@vezinalaw.com

Dated: November 17, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, Sonya A. Rao, hereby certify that on this day November 17, 2021, I filed the foregoing document using the Court's CM/ECF system, resulting in service on all counsel of record in this matter.

*/s/ Sonya A. Rao*
Sonya A. Rao